# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ARCHITECTS & ENGINEERS FOR 9/11 TRUTH
et al.,

                Plaintiffs,

     v.

GINA RAIMONDO, in her official capacity as
Secretary of Commerce, et al.,

                Defendants.

No. 1:21-cv-2365 TNM

## DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ................................................................................1

BACKGROUND ..................................................................................2

    I.       STATUTORY AND REGULATORY BACKGROUND ..........................2

        A.    The Information Quality Act ...........................................2

        B.    OMB Guidelines ....................................................3

        C.    DOC Guidelines ....................................................6

        D.    NIST Guidelines ...................................................7

        E.    The NCST Act ....................................................10

    II.      FACTUAL AND PROCEDURAL BACKGROUND ...........................11

        A.    NIST's WTC Investigation and Reports ......................11

        B.    Plaintiffs' Claims ...............................................12

STANDARD OF REVIEW ...................................................................14

ARGUMENT ..................................................................................16

    I.       PLAINTIFFS LACK STANDING ........................................16

        A.    Plaintiffs Fail To Identify a Cognizable Informational Injury Pursuant to Either the NCST Act or the IQA ..............18

        B.    Plaintiffs' Speculative Claims Fail To Satisfy Causation or Redressability ..............................................22

    II.      PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED...............................................25

        A.    Plaintiffs' IQA Claims Are Not Subject to Judicial Review (Counts I-VIII) ...............................................25

               1.    NIST's Responses to IQA Correction Requests Are Committed to  Agency Discretion by Law and Thus Unreviewable ...............................................26

2. NIST's Responses to Plaintiffs' IQA Correction Request and Appeal Are Not Final Agency Actions Subject to Judicial Review ...............................................................29

B. Plaintiffs' NCST Act Claim Is Time-Barred and Not Subject to Judicial Review (Count IX) .......................................................31

C. Plaintiffs' Procedural Claim Fails To Identify a Plausible Procedural Violation Cognizable Under the APA (Count X) .......34

CONCLUSION ........................................................................................37

## **TABLE OF AUTHORITIES**

### **Cases**

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
    429 F.3d 1136 (D.C. Cir. 2005) ................................................................33

*Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532 (1970) ...................................36

*\*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.,* 946 F.3d 615 (D.C. Cir. 2020) ......29

*\*Ams. for Safe Access v. HHS,*
    No. 07-1049, 2007 WL 4168511 (N.D. Cal. Nov. 20, 2007) .......................... 27-28

*Am. Waterways Operators v. Wheeler*, 507 F. Supp. 3d 47 (D.D.C. 2020) ....................36

*Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206 (11th Cir. 2015) ..........26

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................15, 36

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................15

*\*Bennett v. Spear*, 520 U.S. 154 (1997) ..................................................30, 32

*Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204 (1988) ................................29

*Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627 (D.C. Cir. 2019) ...............................30

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) ........................................35

*Clean Label Proj. Found. v. Garden of Life, LLC*,
    No. CV 20-3229, 2021 WL 4318099 (D.D.C. Sept. 23, 2021) ..........................17

*Cole v. Copan* ("*Cole I*"), 485 F. Supp. 3d 243 (D.D.C. 2020) ...........................11, 20, 33

*Cole v. Copan* ("*Cole II*"),
    No. 19-1182, 2020 WL 7042814 (D.D.C. Nov. 30, 2020) .....................11, 19, 33

*CREW v. U.S. Dep't of Justice*, 846 F.3d 1235 (D.C. Cir. 2017) .............................20, 33

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ....................................14

*\*Dalton v. Specter,* 511 U.S. 462 (1994) ................................................32, 33

*Deripaska v. Yellen*, No. 19-CV-00727, 2021 WL 2417425 (D.D.C. June 13, 2021) .....32

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997) ..................15

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017), *cert. denied*, 139 S. Ct. 791 (2019) ...................19

\*Family Farm All. v. Salazar*, 749 F. Supp. 2d 1083 (E.D. Cal. 2010) ..........................21

*Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998) ...................................................19, 23

*Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) (en banc) .................17, 23

\*Franklin v. Massachusetts,* 505 U.S. 788 (1992) .......................................................32, 33

*Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016) ..........................................19

*Fund for Animals v. Mainella*, 335 F. Supp. 2d 19 (D.D.C. 2004) ...................................15

*Grand Lodge of the Fraternal Order of Police v. Ashcroft*,
   185 F. Supp. 2d 9 (D.D.C. 2001) ...........................................................................15

*Haas v. Gutierrez*, No. 07 CV 3623, 2008 WL 2566634 (S.D.N.Y. June 26, 2008) .......21

*Harkonen v. U.S. Dep't of Justice*, 800 F.3d 1143 (9th Cir. 2015) ...................................3

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...................................................17

*Heckler v. Chaney*, 470 U.S. 821 (1985) ........................................................................27

*Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007) .........................15

*Jefferson v. Harris*, 170 F. Supp. 3d 194 (D.D.C. 2016) ................................................32

*Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033 (D.C. Cir. 2003) .......................15

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994) .............................................14

*Kraft v. Off. of the Comptroller of Currency*,
   No. 4:20-CV-04111, 2021 WL 1251393 (D.S.D. Apr. 5, 2021) ..........................26

\*Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26 (D.D.C. 2020),
   *aff'd*, 848 F. App'x 428 (D.C. Cir. 2021), *cert. denied*, No. 21-93,
   2021 WL 4508610 (U.S. Oct. 4, 2021) ......................................................18, 20, 23

*Lenox Hill Hosp. v. Shalala*, 131 F. Supp. 2d 136 (D.D.C. 2000) ...................................26

\*Lincoln v. Vigil*, 508 U.S. 182 (1993) .................................................................26, 27, 28

iii

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...............................16, 17

*Marino v. Nat'l Oceanic & Atmospheric Admin.,* 451 F. Supp. 3d 55 (D.D.C. 2020) .....18

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) .........................................................31

\*Muslim Advocates v. U.S. Dep't of Justice,
    2019 WL 3254230 (N.D. Cal. July 19, 2019) ....................................27, 28, 30, 35

*Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020) ...........27

*Pub. Citizen v. Dep't of Justice,* 491 U.S. 440 (1989) .....................................................19

*Pub. Citizen Health Rsch. Grp. v. Pizzella*, 513 F. Supp. 3d 10 (D.D.C. 2021) ..............20

*Quick v. U.S. Dep't of Commerce*, 775 F. Supp. 2d 174 (D.D.C. 2011) ...................11, 33

*Renne v. Geary*, 501 U.S. 312 (1991) ...............................................................................16

\*Salt Inst. v. Leavitt, 440 F.3d 156 (4th Cir. 2006) .......... 20-21, 22, 23, 27, 29, 30, 34, 35

*Salt Inst. v. Thompson,* 345 F. Supp. 2d 589 (E.D. Va. 2004), *aff'd on other grounds
    sub nom Salt Inst. v. Leavitt*, 440 F.3d 156 (4th Cir. 2006) ........................... 28-29

*Seeger v. U.S. Dep't of Def.,* 306 F. Supp. 3d 265 (D.D.C. 2018) .................................32

\*Shawnee Tribe v. Mnuchin, 984 F.3d 94 (D.C. Cir. 2021) ...........................................26

*Sierra Club v. EPA*, 755 F.3d 968 (D.C. Cir. 2014) .......................................................25

*Sierra Club v. Jackson*, 648 F.3d 848 (D.C. Cir. 2011) ..................................................26

\*Single Stick, Inc. v. Johanns, 601 F. Supp. 2d 307 (D.D.C. 2009), *aff'd in relevant
    part on other grounds, Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678
    (D.C. Cir. 2010) ...............................................................................................30, 35

*Slovinec v. Georgetown Univ.,* 268 F. Supp. 3d 55 (D.D.C. 2017),
    *aff'd*, No. 17-7122, 2018 WL 1052650 (D.C. Cir. Jan. 26, 2018) ...........13, 16, 36

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ...............................................................16

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ...........................................16

*Stewart v. McPherson*, 955 F.3d 1102 (D.C. Cir. 2020) .................................................26

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ........................................................17

*Toledo Hosp. v. Becerra*,
   No. 19-CV-3820, 2021 WL 4502052 (D.D.C. Sept. 30, 2021) ..........................33

*Turlock Irrigation Dist. v. FERC*, 786 F.3d 18 (D.C. Cir. 2015) ....................................23

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
   892 F.3d 332 (D.C. Cir. 2018) ...........................................................................31

*W. Coal Traffic League v. Surface Transp. Bd.*,
   No. 20-1058, 2021 WL 2172555 (D.C. Cir. May 28, 2021) ...............................25

## <u>Statutes</u>

Information Quality Act ("IQA"), Pub. L.  No. 106-554, § 515,
   114 Stat. 2763 (2000) (codified at 44 U.S.C. § 3516 note) ........................ *passim*

National Construction Safety Team ("NCST") Act, Pub. L. No. 107-231,
   116 Stat. 1471 (2002) (codified at 15 U.S.C. §§ 7301-7313 and
   amending 15 U.S.C. § 281a) ........................................................ *passim*

5 U.S.C. § 551 ...................................................................................................30

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 ..........................10-11, 19, 20, 33

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ............................... *passim*

5 U.S.C. § 701 ...............................................................................................26, 27

5 U.S.C. § 702 ...................................................................................................26

5 U.S.C. § 704 ...........................................................................................20, 29, 34

5 U.S.C. § 706 ...................................................................................1, 2, 14, 30, 33

15 U.S.C. § 281a ........................................................................................10, 24, 31

15 U.S.C. § 7301 ...............................................................................................10

15 U.S.C. § 7306 ........................................................................10, 11, 19, 25, 33

15 U.S.C. § 7307 ..................................................................................10, 19, 33

15 U.S.C. § 7312 ........................................................................10, 24, 31, 33

28 U.S.C. § 2401 ...............................................................................................31

**Regulations**

OMB, Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility,
and Integrity of Information Disseminated by Federal Agencies;
Republication, 67 Fed. Reg. 8452 (Feb. 22, 2002) ...................................... *passim*

Dep't of Commerce, Guidelines for Ensuring and Maximizing the Quality,
Objectivity, Utility, and Integrity of Disseminated Information ("DOC
Guidelines"), 67 Fed. Reg. 62685 (Oct. 8, 2002) ......................................... 6-7, 29

## INTRODUCTION

The Information Quality Act ("IQA") directs the Office of Management and Budget ("OMB") to oversee administrative measures aimed at maximizing the quality, objectivity, utility, and integrity of information disseminated by federal agencies. OMB thus issued guidelines that, in turn, required other federal agencies to develop their own information quality guidelines while vesting in each agency significant discretion over the operational details of its information quality mechanisms. Although the IQA allows affected persons to seek correction of disseminated information directly from an agency, neither Congress nor OMB set forth any standards governing this administrative process, instead leaving it to each agency to determine how to assess such requests and whether to take any action in response. In accord with this broad discretion, every court to have considered an IQA claim, whether brought directly under the IQA or framed as a challenge under the Administrative Procedure Act ("APA"), has rejected it, reasoning that third parties have no enforceable legal rights at stake when it comes to their IQA correction requests.

This case is no different. Here, plaintiff Architects & Engineers for 9/11 Truth ("AE"), along with eighteen individual plaintiffs, (collectively "Plaintiffs") seek judicial review of a response by the National Institute of Standards and Technology ("NIST"), a component of the U.S. Department of Commerce ("the DOC"), to Plaintiffs' IQA correction request, submitted to NIST in April 2020, regarding a report that NIST had issued over a decade earlier addressing the collapse of World Trade Center ("WTC") 7, a forty-seven story office building in the same complex as the two WTC towers, on September 11, 2001. Plaintiffs assert ten claims against NIST under the APA, 5 U.S.C. § 706(2), including eight claims challenging NIST's failure to accept the arguments Plaintiffs made in their IQA correction request; one claim challenging the WTC 7 report itself on the same grounds raised in Plaintiffs' IQA claims; and one claim alleging that NIST failed to

follow its own procedures when responding to Plaintiffs' request.

Plaintiffs' claims should be dismissed because Plaintiffs lack standing and fail to state claims under the APA. In dismissing previous IQA lawsuits, courts have consistently found that the IQA imposes no mandatory duties on agencies and, instead, that agencies' IQA decisions are committed to their discretion by law. Because the IQA implicates no rights or interests of Plaintiffs, Plaintiffs fail to identify cognizable injuries, and their claims are not redressable. Plaintiffs' claims also fail to identify a "final agency actions" reviewable under the APA § 706(2), and any challenge to NIST's 2008 report is time-barred. For these reasons, as more fully explained below, the Court should grant Defendants' motion to dismiss without leave to amend.

## BACKGROUND

### I.      STATUTORY AND REGULATORY BACKGROUND

#### A.      The Information Quality Act

Congress enacted the IQA in a note to the Consolidated Appropriations Act of 2001, Pub. L. No. 106-554, § 1(a)(3) (Title V, § 515), 114 Stat. 2763 (2000) (codified at 44 U.S.C. § 3516 note). The IQA directed OMB to issue "guidelines" that provide "policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the purposes and provisions of the . . . Paperwork Reduction Act." *Id.* § 515(a). The IQA also directed OMB to include three specific requirements in its guidelines: (1) that federal agencies develop their own information quality guidelines within one year of the issuance of OMB's guidelines; (2) that federal agencies establish administrative mechanisms allowing affected persons to seek and obtain correction of information that does not comply with OMB guidelines; and (3) that federal agencies report periodically to OMB on the number and nature of complaints

that they receive regarding the accuracy of the information they disseminate. *See id.* § 515(b)(2). The IQA thus "creates an administrative system designed to permit federal agencies and OMB to monitor and improve the information used and disseminated by federal agencies." *Harkonen v. U.S. Dep't of Justice*, 800 F.3d 1143, 1148 (9th Cir. 2015). Notably, the IQA does not provide a mechanism for judicial review of the quality of information or any avenue for judicial relief.

### B.     OMB Guidelines

OMB published its IQA guidelines in February 2002. *See* OMB, Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication, 67 Fed. Reg. 8452 (Feb. 22, 2002). By their terms, the OMB guidelines apply only to "information" that is "disseminated" by a federal agency. *Id.* at 8458. With respect to such disseminated information, the OMB guidelines assign to federal agencies three responsibilities. First, agencies must issue their own information quality guidelines designed to maximize the quality, objectivity, utility, and integrity of information disseminated by the agency. *Id.* at 8458. Second, agencies must establish "administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines." *Id.* at 8459. Third, agencies must, on an annual basis, "[r]eport to the Director of OMB the number and nature of [information quality] complaints received by the agency" and "how such complaints were resolved." *Id.* at 8458-59.

The consistent theme throughout the OMB guidelines is that "agencies must apply these standards flexibly," "in a common-sense and workable manner," and that the guidelines are not intended to "impose unnecessary administrative burdens that would inhibit agencies from continuing to take advantage of the Internet and other technologies to disseminate information that

can be of great benefit and value to the public." *Id.* at 8453. For example, the OMB guidelines provide that federal agencies are to "adopt a basic standard of quality . . . as a performance goal," and to develop internal processes for reviewing the quality of information before dissemination "[a]s a matter of good and effective agency information resources management," while leaving to the agency the determination of what level of quality is "appropriate to the nature and timeliness of the information to be disseminated." *Id.* at 8458. OMB recognized that more important information, such as "influential scientific, financial, or statistical information," should be held to higher quality standards but that in all cases, "information quality comes at a cost." *Id.* at 8452-53. OMB thus directed that, in all cases, "agencies should weigh the costs . . . and the benefits of higher information quality" when formulating their guidelines. *Id.* at 8453.

OMB further explained that the term "influential," for purposes of the IQA, refers to information that "will have or does have a clear and substantial impact on important public policies or important private sector decisions." *Id.* at 8455. However, given the variety of information disseminated by different agencies, OMB delegated to each agency the authority "to define 'influential' in ways appropriate for it given the nature and multiplicity of issues for which the agency is responsible." *Id.* at 8455. In order to further minimize administrative burdens, OMB directed agencies to "incorporate [quality standards] into their existing agency information resources management and administrative practices rather than create new and potentially duplicative or contradictory processes." *Id.* at 8453. Agencies thus maintain substantial discretion in determining how best to ensure the quality of the information they disseminate.

With respect to the administrative correction mechanisms, the OMB guidelines require agencies to "specify appropriate time periods for agency decisions on whether and how to correct the information" and to "establish an administrative appeal process to review the agency's initial

4

decision," which will include "appropriate time limits in which to resolve such requests for reconsideration." *Id.* at 8459. Agencies are to "respond to complaints in a manner appropriate to the nature and extent of the complaint," which may include "personal contacts via letter or telephone, form letters, press releases or mass mailings that correct a widely disseminated error or address a frequently raised complaint." *Id.* OMB makes clear, however, that agencies should correct information only "where appropriate," and that "[t]hese administrative mechanisms shall be flexible" and "appropriate to the nature and timeliness of the disseminated information." *Id.* As explained in the preamble to the OMB guidelines:

> Agencies, in making their determination of whether or not to correct information, may reject claims made in bad faith or without justification, and are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved, and explain such practices in their annual fiscal year reports to OMB.

*Id.* at 8458. In the preamble to the guidelines, OMB explained that it did not "envision administrative mechanisms that would burden agencies with frivolous claims," nor should these mechanisms "disrupt[] agency processes." *Id.*

In a 2019 memo, OMB provided further clarification regarding the procedures agencies should follow when conducting pre-dissemination review of their information products, and when responding to requests for correction and appeals. *See* OMB, Memorandum M-19-15 (Apr. 24, 2019), *available at* https://www.whitehouse.gov/wp-content/uploads/2019/04/M-19-15.pdf. The 2019 memo directed agencies to "provide greater specificity" in defining what information would qualify as "'influential' in the context of their specific missions," in order to "enable program managers to determine if information is 'influential' early in the information generation process and to impose suitable control measures." *Id.* at 3-4.

In regard to IQA correction requests, the 2019 memo continued to defer to agencies in regard to whether a correction was warranted, emphasizing only that "an agency should respond thoroughly to substantive RFCs, including by making clear, as fully as practicable, the data underlying the challenged information, the methodologies the agency used to analyze the data, the reasons for use of such methodologies, and any peer reviews addressing the agency's analysis." *Id.* at 10. The 2019 memo also indicates that agency procedures should ensure that "the staff reviewing appeals is independent of the staff who prepared the initial response" and that "staff reviewing appeals should be sufficiently senior that they are effectively able to disagree with the assessment of colleagues who prepared the initial response." *Id.* at 10-11.

### C.   DOC Guidelines

In compliance with the OMB Guidelines, the DOC issued information quality guidelines in 2002. *See* Dep't of Commerce, Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Disseminated Information ("DOC Guidelines"), 67 Fed. Reg. 62685 (Oct. 8, 2002). As explained in the DOC Guidelines, because of the diverse nature of the missions and activities of different operating units within the DOC, ranging "from conducting each decennial census to forecasting the weather," the DOC delegated to each such operating unit the responsibility to publish its own information quality standards and to establish administrative mechanisms for addressing IQA correction requests directed to the unit. *See id.* at 62686, 62687. The operating unit's responsibilities include defining what qualifies as "influential," in light of the unit's specific missions and activities. *See id.* at 62689. Meanwhile, the DOC's Chief Information Officer retains responsibility for preparing and submitting annual reports to OMB regarding correction requests received by any DOC operating unit. *See id.* at 62686. The DOC noted that, although it intended to comply with its own Guidelines and standards, the DOC Guidelines "are

6

not intended to provide any right to judicial review." *Id.* at 62687. The DOC listed the websites of its operating units where the units' IQA guidelines are published, including NIST's website, at the end of the DOC Guidelines. *See id.* at 62695.

### D. NIST Guidelines

NIST's current IQA guidelines ("NIST Guidelines"), last updated on February 11, 2020, are published on its website at https://www.nist.gov/nist-information-quality-standards.[1] The NIST Guidelines adhere to the final OMB guidelines, including OMB's 2019 memo, as well as the DOC Guidelines and describe NIST's administrative policy and procedures for internally reviewing and substantiating the quality of information it disseminates, as well as the administrative mechanism that NIST has adopted to allow affected persons to seek and obtain, where appropriate, correction of information not complying with the Guidelines.

The NIST Guidelines incorporate OMB's recognition that agencies should weigh costs and benefits of higher information quality when determining the "appropriate level of review and documentation for information disseminated by NIST." NIST Guidelines, Part II (Ex. A at 8). Rather than setting forth uniform procedures or requirements for information quality, the NIST Guidelines set forth performance standards that rely on individualized judgments by NIST staff, depending on the specific circumstance. *See id.* (Ex. A at 8-10). Thus, in order to maximize utility, staff are directed to provide "background and detail . . . commensurate with the importance of the particular information, balanced against the resources required, [that] is appropriate to the nature and timeliness of the information to be disseminated." *Id.* Part II(Utility) (Ex. A at 9). In order to maximize integrity, staff are directed to safeguard information "to a degree commensurate with

---

[1] A pdf of the NIST Guidelines is attached hereto as Exhibit A. Hereinafter, references to the NIST Guidelines will include page numbers referencing the pages of the attached pdf version.

7

the risk and magnitude of harm that could result from the loss, misuse, or unauthorized access to or modification of such information." *Id.* Part II(Integrity) (Ex. A at 9). In order to meet the objectivity requirement, the Guidelines identify various measures that "can" be used, including quality check lists, peer monitoring, and public comment. *Id.* Part II(Objectivity) (Ex. A at 10).

The NIST Guidelines also recognize that program managers "should consider a NIST information product to be influential," and thus subject to stricter quality standards, "when it represents an official view of the agency, and falls within" the category described in OMB's 2019 memo. *Id.* Part II(Pre-Dissemination Review and Peer Review of Influential Scientific Information) (Ex. A at 13). At the same time, the NIST Guidelines note that, for IQA purposes, information is "influential" "when it is a principal basis for a decision by a federal decision-maker." *See id.* The NIST Guidelines explain NIST's determination, pursuant to its authority to define whether its information is "influential," that "[b]ecause NIST is a non-regulatory federal agency, it is not anticipated that NIST will disseminate influential scientific information." *Id.* (Ex. A at 14); *see also* NIST Guidelines (Ex. A at 19) (explaining that because "NIST does not currently produce or sponsor the distribution of influential scientific information (including highly influential scientific assessments)," NIST "has no agenda of forthcoming influential scientific disseminations to post on its website in accordance with OMB's Peer Review Bulletin").

An affected person who "uses, benefits from, or is harmed by" information disseminated by NIST "may request, where appropriate, timely correction of disseminated information that does not comply with applicable information quality guidelines and standards." *Id.* Part III(A-B) (Ex. A at 14-15). The requestor bears the burden "to show both the necessity and type of correction sought." *Id.*, Part III(B)(1) (Ex. A at 15). Moreover, information that has been "subjected to formal, independent, external peer review is presumed to be objective" provided that, for influential

8

scientific information, the peer review meets OMB's requirements. *Id.* "The requester has the burden of rebutting that presumption." *Id.*

If NIST determines that a request has been properly submitted, it will forward the request to the Chief of the NIST division responsible for the dissemination of the information at issue. *Id.*, Part III(B)(5) (Ex. A at 16). The NIST Guidelines indicate that NIST will respond to a request within 120 days unless it receives the requester's agreement to extend its response time. *Id.* The relevant Division Chief will "make a preliminary determination whether the request states a claim" and if so, "will objectively investigate and analyze relevant material to determine whether the disseminated information complies with the applicable published information quality guidelines and standards" and whether a correction is warranted. *Id.* Part III(C) (Ex. A at 17). NIST "may" take corrective measures if it determines that corrective action is "appropriate." *Id.* Any corrective action "will be determined by the nature and timeliness of the information involved and such factors as the significance of the error on the use of the information, and the magnitude of the error." *Id.* The initial decision provided to the requester "will contain a point-by-point response to any relevant data quality arguments contained in the request; and will refer to any peer review that directly considers the issues being raised, if applicable." *Id.*, Part III(C)(3) (Ex. A at 18).

A requester who is not satisfied with the NIST Division Chief's initial decision may appeal that decision within 30 calendar days. *Id.*, Part III(D)(1) (Ex. A at 18). The NIST Guidelines state that the NIST Associate Director for Laboratory Programs will decide the appeal and that "[n]o individuals who were involved in the initial denial will be involved in the review of or response to the appeal." *Id.*, Part III(D)(3) (Ex. A at 19). The appeal decision will usually be communicated to the requester within 60 calendar days after receipt of the appeal. *Id.*

9

E.     The NCST Act

Plaintiffs' IQA correction request at issue in this case concerns two reports issued by NIST pursuant to the National Construction Safety Team ("NCST") Act, Pub. L. No. 107-231, 116 Stat. 1471 (2002) (codified at 15 U.S.C. §§ 7301-7313 and amending 15 U.S.C. § 281a). Enacted in the wake of September 11, 2001, the NCST Act authorizes NIST to establish and deploy a National Construction Safety Team after a building collapse "that has resulted in substantial loss of life or that posed significant potential for substantial loss of life," in order to investigate the likely cause or causes of the collapse. 15 U.S.C. § 7301(a)-(b). Following such an investigation, a Team must issue a public report that includes "an analysis of the likely technical cause or causes of the building failure investigated," "any technical recommendations for changes to or the establishment of evacuation and emergency response procedures," "any recommended specific improvements to building standards, codes, and practices," and "recommendations for research and other appropriate actions needed to help prevent future building failures." *Id.* § 7307. However, NIST has no authority to "require the adoption of building standards, codes, or practices," *id.* § 7312, nor may any report resulting from such an investigation "be admitted as evidence or used in any suit or action for damages," *id.* § 281a.

Although the NCST Act requires that copies of records, information, or investigations be made available to the public on request and at reasonable cost, NIST may withhold from any such release information that is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b). 15 U.S.C. § 7306(a), (b)(1). In addition, NIST is prohibited from publicly releasing information received by the Team in the course of an investigation when NIST's Director "finds that the disclosure of that information might jeopardize public safety." *Id.* § 7306(d). Addressing these provisions in the context of FOIA suits, courts have consistently

10

recognized that § 7306(d) qualifies as an Exemption 3 statute for FOIA purposes and have thus upheld NIST's withholding from FOIA releases any information received during its investigation of the World Trade Center building collapses that its Director has concluded might jeopardize public safety. *See Cole v. Copan* ("*Cole I*"), 485 F. Supp. 3d 243, 252-53 (D.D.C. 2020) (upholding NIST's refusal to release certain notes of eyewitness interviews conducted during the WTC investigation); *Cole v. Copan* ("*Cole II*"), No. 19-1182, 2020 WL 7042814, at *5-6 (D.D.C. Nov. 30, 2020) (upholding NIST's refusal to release "'[a]ll input and result files' of each computer model used by NIST to study the structural response and collapse propagation phase of WTC 7, as well as 'all Excel spreadsheets and other supporting calculations used to develop floor connection failure modes and capacities'"); *Quick v. U.S. Dep't of Commerce*, 775 F. Supp. 2d 174, 178, 180-81 (D.D.C. 2011) (upholding NIST's refusal to release certain raw data files relating to its investigation into the collapse of WTC 7).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     NIST's WTC Investigation and Reports

Pursuant to the NCST Act, NIST assembled a team that conducted investigations; held 23 public meetings to provide briefings, present preliminary findings, and obtain comments; and issued 43 reports in October 2005 addressing the collapse of the two WTC towers on September 11, 2001, as well as three reports in November 2008 addressing the collapse on the same day of WTC 7, a 47-story office building in the WTC complex.[2]  Plaintiffs' IQA correction request and

---

[2]  NIST has published an overview of its WTC investigation on its website at https://www.nist.gov/world-trade-center-investigation. All 45 reports are also publicly available on NIST's website at https://www.nist.gov/el/final-reports-nist-world-trade-center-disaster-investigation. *See also* NIST NCSTAR 1A: the Final Report on the Collapse of WTC Building 7 ("WTC 7 1A Report"), at xxx, xxxv, *available at* https://www.nist.gov/publications/final-report-collapse-world-trade-center-building-7-federal-building-and-fire-safety-0.

11

appeal at issue in this case concerned two of the latter three reports—the WTC 7 1A Report and NIST NCSTAR 1-9: Fire Response and Probable Collapse Sequence of World Trade Center Building 7 ("WTC 7 1-9 Report") (collectively, "WTC 7 Reports" or "Reports"). *See* Corrected Complaint ("Compl.") ¶¶ 3, 86-88 [ECF 3]. As described in the WTC 7 Reports, NIST released drafts of the reports for public comment and made changes to the reports in response. WTC 7 1A Rpt. at xxx; WTC 7 1-9 Rpt. at xxxiv. A NCST Advisory Committee also reviewed and commented on drafts of the Reports, and the Reports were also "peer reviewed by five individual subjects matter experts," prior to NIST's publication of the final version. WTC 7 1A Rpt. at xxxi; WTC 7 1-9 Rpt. at xxxiv-xxxv. NIST also discussed applicable IQA standards in the Reports and concluded that those standards were satisfied. *See* WTC 7 1A Rpt. at xxx-xxxi; WTC 1-9 Rpt. at xxxiv-xxxv.

### B.    Plaintiffs' Claims

Plaintiffs are an organization and eighteen individuals. Compl. ¶¶ 8-42. AE describes itself as a non-profit organization that has conducted its own independent investigation of the causes of the collapse of the WTC towers and WTC 7. *Id.* ¶ 9. AE states that its mission includes investigating and educating the public "as to the true reasons these WTC buildings collapsed on 9/11." *Id.* ¶ 10. In addition to making public presentations and submitting a petition to Congress for a new 9/11 investigation, AE has joined with another organization, the Lawyers' Committee for 9/11 Inquiry, Inc., in submitting an application to the State Department's Rewards for Justice Program, which provides rewards of up to $25 million for information that leads to the arrest or conviction of anyone who plans, commits, or attempts acts of international terrorism against U.S. persons or property. *Id.* ¶¶ 11-15, 96-97. Eight of the individual plaintiffs lost family members on September 11, 2001, though none claims that their family member died as a result of WTC 7's

12

collapse. *Id.* ¶¶ 16-40, 98. The other ten individual plaintiffs are architects and engineers who joined in the IQA request and appeal at issue in this case. *Id.* ¶ 42.

By letter dated April 15, 2020, Plaintiffs submitted an IQA correction request purporting to identify deficiencies in the WTC 7 Reports as well as related FAQs published on NIST's website. *See id.* ¶¶ 84, 86.[3] Plaintiffs sought through their request to prove that the collapse of WTC 7 was due to an intentional act of demolition rather than due to fires following the impact of debris from the collapse of the north WTC tower, as the Reports had concluded. *See id.* ¶¶ 87-88; *cf.* WTC 7 1A Rpt. at xv. NIST denied Plaintiffs' request for correction on August 28, 2020. Compl. ¶ 89. In the initial decision that it provided to Plaintiffs ("Initial Decision"), NIST itemized and separately addressed each of the eight issues that Plaintiffs had raised as warranting correction, concluding in each instance that no correction was warranted. *See* NIST Initial Decision, at 1-10, *available at* https://www.ae911truth.org/images/PDFs/NIST-Response-2020-001.pdf. Plaintiffs submitted an administrative appeal of the Initial Decision on September 28, 2020. *Id.* ¶ 90. NIST denied the appeal on June 30, 2021. *Id.* ¶ 92. In its response to the appeal, NIST indicated that, in accord with NIST guidelines, "no individuals who were involved in the Initial Decision were involved in the review of or preparation of this response to the Appeal," and that "[t]he review on appeal was entirely independent and comprised by a completely new set of individuals in all aspects including technical, administrative, or otherwise." *See* NIST Response to Appeal, at 2, *available at* https://www.ae911truth.org/images/PDFs/Response-to-Appeal-of-NISTs-

---

[3] Plaintiff AE has published Plaintiffs' request, NIST's Initial Decision, Plaintiffs' appeal, and NIST's response to Plaintiffs' appeal on its website, providing links at https://www.ae911truth.org/nist. Because these documents are effectively incorporated by reference in Plaintiffs' Complaint, the Court may consider them without converting this motion to dismiss into a motion for summary judgment. *See Slovinec v. Georgetown Univ.,* 268 F. Supp. 3d 55, 59 (D.D.C. 2017), *aff'd,* No. 17-7122, 2018 WL 1052650 (D.C. Cir. Jan. 26, 2018).

Decision.pdf. NIST further indicated that its "independent review on appeal established that the point-by-point responses to the original request for correction are sound." *Id.* at 2-3. NIST thus denied the appeal. *Id.* at 5.

Plaintiffs filed suit on September 7, 2021, asserting ten claims under the APA, 5 U.S.C. § 706(2). Counts I through VIII claim that NIST's response to Plaintiffs' IQA correction request was arbitrary and capricious because NIST denied their request with respect to each of the eight separate aspects that Plaintiffs had identified as purportedly requiring correction. Compl. ¶¶ 99-319. Count IX asserts that the WTC 7 Reports as well as NIST's investigation underlying those Reports were arbitrary and capricious and not in accordance with law because they were "prepared and conducted in a manner contrary to the spirit and letter of" the NCST Act. Compl. ¶¶ 320-332. Count X asserts that NIST's decision denying Plaintiffs' IQA appeal did not comport with applicable procedural requirements. Compl. ¶¶ 333-340. Specifically, Count X asserts that the NIST or DOC officials who were involved in deciding the appeal had been consulted by the NIST officials who had issued the Initial Decision, or else had superiors who were consulted, Compl. ¶ 337; and that NIST's decision denying the appeal did not include a "point-by-point response to most of the information quality arguments presented in Plaintiffs' appeal," Compl. ¶ 339.

## STANDARD OF REVIEW

In reviewing a motion to dismiss under Rule 12(b)(1), a court is guided by the principle that "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co*., 511 U.S. 375, 377 (1994). Thus, a federal court must presume that it "lack[s] jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). The burden of demonstrating the contrary "'rests upon the party asserting jurisdiction.'" *Id.* But a plaintiff's claims of jurisdiction should be closely scrutinized because a

14

court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). "[I]n deciding a Rule 12(b)(1) motion, it is well established in this Circuit that a court is not limited to the allegations in the complaint, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case." *Fund for Animals v. Mainella*, 335 F. Supp. 2d 19, 22 (D.D.C. 2004) (citing *EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624–25 n. 3 (D.C. Cir. 1997)).

A motion under Federal Rule 12(b)(6) focuses on "the legal sufficiency of the complaint." *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court need not "assume the truth of legal conclusions," *Iqbal*, 556 U.S. at 678, nor "accept inferences that are unsupported by the facts set out in the complaint," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (alterations in original). Thus, in order to withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plaintiff's allegations must be sufficiently detailed "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may

take judicial notice." *EEOC*, 117 F.3d at 624; *cf. Slovinec*, 268 F. Supp. 3d at 59 ("[W]here a document is referred to in the complaint and is central to the plaintiff's claim, such a document . . . may be considered without converting the motion to one for summary judgment." (internal quotation omitted))

## ARGUMENT

## I.    PLAINTIFFS LACK STANDING

A plaintiff who seeks to invoke federal jurisdiction bears the burden of establishing "the irreducible constitutional minimum" of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Standing to sue "is part of the common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). Courts "presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (internal quotation omitted). To satisfy the elements of standing, the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Injury in fact is the "[f]irst and foremost" of standing's three elements. *Steel Co.*, 523 U.S. at 103. "[T]he plaintiff must have suffered an injury in fact—an invasion of a legally protected interest" that is concrete, particularized, and actual or imminent, rather than conjectural or hypothetical. *Lujan*, 504 U.S. at 560. At the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each element of the standing inquiry. *Spokeo*, 136 S. Ct. at 1547.

Here, one of the plaintiffs, AE, is a non-profit organization that appears to assert its own interests rather than that of any members. *See* Compl. ¶¶ 9-15. Assessing an organization's standing requires "the same inquiry as in the case of an individual: Has the plaintiff alleged such

a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?" *Clean Label Proj. Found. v. Garden of Life, LLC*, No. CV 20-3229, 2021 WL 4318099, at *3 (D.D.C. Sept. 23, 2021) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)). In order to show that the defendant's actions have "perceptibly impaired the organization's ability to provide services," as required to establish a concrete injury-in-fact, the organization must "demonstrate: (1) a direct conflict between the challenged conduct and the organization's mission, and (2) a consequent drain on the organization's resources resulting from this direct conflict." *Id*. at *3-4 (internal quotation omitted).

In Count X, Plaintiffs assert a procedural claim. "[A] plaintiff may have standing to challenge the failure of an agency to abide by a procedural requirement ... if that requirement was 'designed to protect [the plaintiff's] threatened concrete interest.'" *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) (quoting *Lujan*, 504 U.S. at 573 n.8). However, "a procedural right *in vacuo* . . . is insufficient to create Article III standing." *Summers v. Earth Island Inst*., 555 U.S. 488, 496 (2009). A plaintiff alleging an agency's failure to follow a required procedure thus must demonstrate a concrete interest beyond the alleged procedural violation itself, akin to the injury-in-fact required in a traditional standing analysis. *See id.* at 496–97 (2009) ("Unlike redressability, . . . the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."). Moreover, the D.C. Circuit "has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Fla. Audubon Soc'y,* 94 F.3d at 664.

Plaintiffs assert that NIST's dissemination of "inaccurate, unreliable, or biased information concerning the collapse of WTC 7 may lead to (and may have already led to) the adoption of

unnecessary and improper changes to building codes, standards, and practices," which "could, in turn, lead to needless deaths and injuries if such codes and standards are too lenient or to unnecessary expenses if they are too strict." Compl. ¶ 77. Plaintiffs further assert that, "[a]lthough the collapse of WTC 7 on 9/11 is not known to have directly caused the death of any member of the family of the Plaintiffs," *id.* ¶ 98, the corrections in the WTC 7 Reports that they seek could "cast extreme doubt on NIST's separate findings that the total destruction of two other WTC buildings on 9/11, the WTC Towers, was caused by the airplane impacts and ensuing fires alone, and would most likely lead to congressional and criminal investigations to identify those responsible for the destruction of all three buildings." *Id.* ¶ 80. Plaintiffs also assert that the corrections they seek could "materially affect[]" other proceedings in which some Plaintiffs are involved, including AE's application for a reward from the State Department's Rewards for Justice Program. *Id.* ¶¶ 95-97. Plaintiffs' allegations are insufficient to confer standing.

### A.   Plaintiffs Fail To Identify a Cognizable Informational Injury Pursuant to Either the NCST Act or the IQA

Plaintiffs' asserted injuries all derive either from NIST's issuance of the reports required by the NCST Act or its alleged failure to correct information pursuant to the IQA, and they therefore all amount to assertions of an informational injury. *Cf. Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26, 32-33 (D.D.C. 2020) (recognizing that alleged results of disclosure of information are "part and parcel of the alleged informational injury" because they "stem from the [agency's] failure to disclose the desired information"), *aff'd*, 848 F. App'x 428 (D.C. Cir. 2021), *cert. denied*, No. 21-93, 2021 WL 4508610 (U.S. Oct. 4, 2021); *Marino v. Nat'l Oceanic & Atmospheric Admin.,* 451 F. Supp. 3d 55, 62 (D.D.C. 2020) (harms that are "inextricably linked" to plaintiffs' inability to obtain requested information, or that are "mere second-order consequences" of a plaintiff's inability to access information, are "fundamentally

18

derivative" of an informational injury and thus are themselves "unavoidably informational in nature"). However, neither the NCST Act nor the IQA provides the requisite statutory predicate for such an informational injury.

In some circumstances, a plaintiff may establish informational standing "when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (citing *Pub. Citizen v. Dep't of Justice,* 491 U.S. 440, 449 (1989)). However, "[t]o carry its burden of demonstrating a 'sufficiently concrete and particularized informational injury,' the plaintiff must show that '(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'" *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)), *cert. denied*, 139 S. Ct. 791 (2019).

Plaintiffs' claims here fail at step one. Although the NCST Act requires agencies to issue reports, 15 U.S.C. § 7307, Plaintiffs concede that NIST already complied with that requirement over a decade ago by issuing the WTC 7 Reports in November 2008. Compl. ¶ 64. Moreover, although Plaintiffs ask the Court to order NIST "to make public all of its WTC 7 computer modeling(s) including all computer code, data, assumptions, and input used with or for that modelling," Compl. at 78, the NCST Act provides for information to be disclosed only in response to a "request," and only where the information is not protected from disclosure under FOIA, 5 U.S.C. § 552(b), or the NCST Act itself. 15 U.S.C. § 7306; *see Cole II*, 2020 WL 7042814, at *5-6 (holding WTC 7 data was covered by § 7306(c) and thus was not required to be disclosed even in response to an administrative request). Far from conferring a right to information, this language

19

indicates that any request for information relating to NCST investigations or reports would have to be channeled through NIST's FOIA process, which in turn would render it subject to the judicial review mechanism in the FOIA itself. *See* 5 U.S.C. § 552(a)(4)(B); *CREW v. U.S. Dep't of Justice*, 846 F.3d 1235, 1245–46 (D.C. Cir. 2017) (holding availability of judicial review under the FOIA qualified as an adequate alternative remedy that precluded an APA suit under 5 U.S.C. § 704); *cf. Cole I*, 485 F. Supp. 3d at 250 (FOIA suit addressing FOIA request seeking information relating to NCST Act investigation of WTC building collapses). Plaintiffs nowhere allege that they have sought the information they identify through NIST's FOIA process, but even if they had, such FOIA requests could not result in informational injuries for purposes of Plaintiffs' APA claims here. *Cf. Pub. Citizen Health Rsch. Grp. v. Pizzella*, 513 F. Supp. 3d 10, 20–21 (D.D.C. 2021) (holding plaintiffs failed to satisfy first prong of informational injury test for purposes of their APA claims where agency regulation simply provided that information would be made available through FOIA requests). Plaintiffs therefore cannot rely on the NCST Act as the basis for their asserted informational injuries.

Nor does the IQA Act allow for a cognizable informational injury. Although Plaintiffs make conclusory assertions regarding the IQA Act's meaning, "the case law does not require the Court to ignore the plain terms of a statute, even at the pleading stage." *Lawyers' Comm.*, 424 F. Supp. 3d at 32. The plain terms of the IQA require OMB to issue guidelines to federal agencies regarding information quality and to in turn require agencies to issue their own guidelines, establish administrative correction mechanisms, and provide periodic reports to OMB regarding correction requests. IQA, Pub. L. No. 106-554, § 515. Courts have uniformly recognized that the IQA's language "creates no legal rights in any third parties," and specifically, that the IQA "does not create a legal right to access to information or to correctness." *Salt Inst. v. Leavitt*, 440 F.3d

156, 159 (4th Cir. 2006); *see also Family Farm All. v. Salazar*, 749 F. Supp. 2d 1083, 1103 (E.D. Cal. 2010) (concluding that "*Salt Institute*'s reasoning is sound" and that plaintiffs in that case similarly lacked standing); *Haas v. Gutierrez*, No. 07 CV 3623, 2008 WL 2566634, at *6 (S.D.N.Y. June 26, 2008) (dismissing plaintiff's IQA challenge to NIST's WTC investigation because the IQA "does not create any legal rights, enforceable by unrelated third parties, to information or its correctness").

The OMB guidelines are similarly devoid of any language vesting third parties with rights to information or its correction. To the contrary, the OMB guidelines vest discretion in agencies regarding what level of information quality is "appropriate to the nature and timeliness of the information to be disseminated." 67 Fed. Reg. at 8458-59. OMB similarly directs that agencies' administrative mechanisms allowing affected persons to seek correction "shall be flexible" and "appropriate to the nature and timeliness of the disseminated information," and that agencies' responses be "in a manner appropriate to the nature and extent of the complaint," noting that such responses may be made through personal contacts via letter or telephone, press releases, or mass mailings. *Id.* at 8459. Thus, nothing in the OMB Guidelines requires an agency to make corrections in any given instance, and the preamble makes clear that this omission is intended to vest sole discretion in the agencies themselves: "Agencies, in making their determination of whether or not to correct information, may reject claims made in bad faith or without justification, and are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved." *Id.* at 8458. Courts have recognized that the lack of any judicially manageable standards in the OMB Guidelines reinforces the lack of any enforceable legal rights in the IQA itself, and that "[t]here is no standing" to assert IQA-based claims. *See Family Farm All.*, 749 F. Supp. 2d at 1103.

21

NIST's IQA guidelines retain this discretion, stating that "in deciding the appropriate level of review and documentation for information disseminated by NIST, the costs and benefits of using a higher quality standard or a more extensive review process will be considered," and "[w]here necessary, other compelling interests such as privacy and confidentiality protections will be considered." NIST Guidelines, Part II (Ex. A at 8); *see also id.* (Ex. A at 9) (where utility of information may be enhanced by greater transparency of background and detail, "[t]he level of such background and detail is commensurate with the importance of the particular information, balanced against the resources required, and is appropriate to the nature and timeliness of the information to be disseminated"); *id.* (Ex. A at 10) ("Information disseminated by NIST is reliable and accurate to an acceptable degree of error as determined by factors such as the importance of the information, its intended use, time sensitivity, expected degree of permanence, relation to the primary mission(s) of the disseminating office, and the context of the dissemination, balanced against the resources required and time available"). NIST also retains discretion regarding its responses to IQA correction requests. *See id.*, Part III(C)(2) (Ex. A at 17) (Corrective action will be taken if "appropriate," and may take various forms, as determined "by the nature and timeliness of the information involved and such factors as the significance of the error on the use of the information and the magnitude of the error").

In light of the absence of any rights-creating language in the IQA or agency regulations, courts have recognized that plaintiffs cannot establish an informational injury that would allow for an APA claim based on an alleged IQA violation. In *Salt Institute*, as in this case, the plaintiff requested that a federal agency correct certain information it had disseminated. *Salt Inst.,* 440 F.3d at 157. After that request was denied, the plaintiff brought an action under the APA and IQA—again, just as Plaintiffs have done here. *Id.* at 157–58. The court of appeals concluded that, because

the IQA creates no legal rights, the requesters "ha[d] not alleged an invasion of a legal right and, thus, have failed to establish an injury in fact sufficient to satisfy" the jurisdictional requirements of Article III of the Constitution. *Id.* at 159. The court distinguished the IQA from the statute at issue in *Akins*, the Federal Election Campaign Act of 1971, which "clearly created a right to information by requiring the [FEC] to make certain information available to the public." *Salt Inst.,* 440 F.3d at 159. This Court should similarly find that Plaintiffs have not alleged the infringement of a legal right pursuant to the IQA and that they lack standing based on an alleged informational injury.

**B.      Plaintiffs' Speculative Claims Fail To Satisfy Causation or Redressability**

Plaintiffs also fail to establish the causation or redressability prongs of standing because they rely on speculative assumptions of how Congress, the State Department, or other independent third parties might react if the WTC 7 Reports were revised. *See Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 25 (D.C. Cir. 2015) ("[W]e have repeatedly held that litigants cannot establish an Article III injury based on the 'independent actions of some third party not before this court.'" (formatting modified) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 670). Indeed, this Court has already rejected the notion that the speculative possibility of a reward under the Rewards for Justice Program—which, the Court recognized, lies within the sole discretion of the Secretary of State—could support AE's standing in a case similar to this one, where the plaintiffs sought 9/11-related information from the FBI, rather than NIST. *Lawyers' Comm.,* 424 F. Supp. 3d at 34. The Court should reject AE's similar assertions here for the same reasons.

Plaintiffs' speculation regarding the potential impact of their requested corrections *on them* is particularly far-fetched given that those corrections relate solely to reports that concerned the collapse of WTC 7. None of the proceedings in which Plaintiffs claim to be involved relate to the

collapse of WTC 7. *Compare* Compl. ¶ 95 (asserting impacts on pending petitions submitted by plaintiffs Campbell and McILvaine), *with* Compl. ¶¶ 16, 33 (indicating family members of plaintiffs Campbell and McIlvaine were killed due to the collapse of the WTC North Tower, not WTC 7), ¶ 98 (conceding "the collapse of WTC 7 on 9/11 is not known to have directly caused the death of any member of the family of the Plaintiffs"). The notion that Congress may call for new investigations of the two WTC towers' collapse as a result of Plaintiffs' requests regarding a different building, Compl. ¶¶ 80, 98, and that such potential investigations would in turn "lead to the discovery that explosives and incendiaries were used to cause the complete collapse" of the towers, *id.* ¶ 98, relies on a speculative chain of inferences about Congress and other third parties. Plaintiffs' theory assumes not only that these parties would initiate new investigations into the September 11, 2001 collapse of the two WTC towers, but also that any such investigations would overturn the common understanding that the WTC towers collapsed because hijacked airplanes were flown into them, and would instead conclude that the towers collapsed due to controlled demolitions on the ground unrelated to airplane impacts. Such a notion is pure conjecture at best. Moreover, the NCST Act in any case precludes the WTC 7 Reports, any correction thereto, or any other reports prepared under the NCST Act from being "admitted as evidence or used in any suit or action for damages." 15 U.S.C. § 281a. Similarly, as described above, NIST has no authority to "require the adoption of building standards, codes, or practices," 15 U.S.C. § 7312, and Plaintiffs fail to identify any purportedly unnecessary change in codes or standards that any third party made in response to the WTC 7 Reports. Plaintiffs thus fail entirely to establish the causation prong of standing.

The lack of any legal requirement for the Court to enforce here under the NCST Act or the IQA also renders Plaintiffs' claims unredressable. In order to satisfy the redressability requirement,

an injury must be "capable of resolution and likely to be redressed by judicial decision." *W. Coal Traffic League v. Surface Transp. Bd.*, No. 20-1058, 2021 WL 2172555, at *4 (D.C. Cir. May 28, 2021) (quoting *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014)). The court in *W. Coal* held that a challenge to a decision by the Surface Transportation Board to discontinue a rulemaking because the Board members were deadlocked was "not capable of resolution through a judicial decision because [the court] lack[s] the power to issue an order to break the Board's deadlock." *Id.*

Similarly here, the Court lacks the power to provide the relief that the Complaint seeks— an order compelling NIST to correct the WTC 7 Reports in the manner that Plaintiffs claim is warranted and to make public certain data. *See* Compl. at 78. Nothing in the IQA or agency guidelines requires NIST to respond in a particular way to an IQA correction request or to make corrections even if errors were identified. Rather, the OMB guidelines emphasize that agencies "are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved." 67 Fed. Reg. at 8458-59; *accord* OMB, 2019 memo, at 14. NIST's Guidelines retain this discretion as described above. NIST Guidelines, at 17-18. And no provision of the IQA or agency guidelines provides a basis for the Court to order disclosure of data in response to an IQA correction request, particularly in light of the restrictions on disclosure set forth in 15 U.S.C. § 7306. Plaintiffs' claims therefore are not redressable and should be dismissed for lack of standing.

## II. PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A. Plaintiffs' IQA Claims Are Not Subject to Judicial Review (Counts I-VIII)

Although the Court may end its analysis upon concluding that Plaintiffs lack standing, Plaintiffs also fail to state claims upon which relief can be granted. Counts I through VIII raise

APA challenges to NIST's denial of Plaintiffs' IQA correction request. The same characteristics that preclude a showing of informational injury for an IQA challenge also render these claims unreviewable under the APA and thus subject to dismissal under Rule 12(b)(6) for failure to state a claim.

        **1.**      **NIST's Responses to IQA Correction Requests Are Committed to Agency Discretion by Law and Thus Unreviewable**

First, these claims are unreviewable because the IQA vests agencies with discretion over how to respond to IQA correction requests, and there are no meaningful standards that a court could apply to review an agency's response. "[A] complaint seeking review of agency action 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2), has failed to state a claim under the [APA], and therefore should be dismissed under Rule 12(b)(6)." *Stewart v. McPherson*, 955 F.3d 1102, 1104 (D.C. Cir. 2020) (quoting *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011))[4] Judicial review of administrative decisions may be barred under § 701(a)(2) in two circumstances. *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 99 (D.C. Cir. 2021). First, an agency decision may fall within a category "that courts traditionally have regarded as 'committed to agency discretion.'" *Id.* (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). Thus, in *Lincoln*, the Supreme Court held that an Indian Health Service decision to discontinue spending funds from a lump-sum appropriation on a particular program was unreviewable because such a decision "requires 'a complicated balancing of a number of factors which are peculiarly within [the

---

[4] Some courts, including in this Circuit, have held that reviewability under § 701(a)(2) "is a matter of subject matter jurisdiction," in keeping with the fact that § 701(a)(2) identifies an exception to the waiver of sovereign immunity set forth in 5 U.S.C. § 702. *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1214 (11th Cir. 2015); *see also Kraft v. Off. of the Comptroller of Currency*, No. 4:20-CV-04111-RAL, 2021 WL 1251393, at *9 (D.S.D. Apr. 5, 2021) (same); *Lenox Hill Hosp. v. Shalala*, 131 F. Supp. 2d 136, 141 (D.D.C. 2000) (same). Thus, in the alternative, the Court should dismiss Plaintiffs' IQA claims on this basis under Rule 12(b)(1).

agency's] expertise,'" including "whether its 'resources are best spent' on one program or another," or "whether the agency has enough resources' to fund a program 'at all.'" *Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). Second, "even if agency action is presumptively reviewable," § 701(a)(2) nevertheless precludes review if a statute is "drawn in such broad terms" that "a court would have no meaningful standard against which to judge the agency's exercise of discretion"—in other words, "'there is no law to apply.'" *Shawnee Tribe*, 984 F.3d at 99 (quoting *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020)). NIST's responses to IQA correction requests are unreviewable under either standard.

The framework governing NIST's IQA assessments is largely similar to that in *Lincoln*, in that it relies on an agency's discretionary internal calculus of how best to prioritize and fund its activities, including with respect to the level of resources to devote to information quality. *Cf.* NIST Guidelines, Part II (Ex. A at 8) (recognizing that, under the OMB guidelines, NIST has discretion to weigh "the costs and benefits of using a higher quality standard or a more extensive review process"). Consistent with that discretion, nothing in the IQA requires an agency to apply specific standards in response to IQA correction requests. As another court has reasoned, "[t]he OMB Guidelines' use of discretionary language (i.e., 'where appropriate,' 'flexible,' 'that they conclude is appropriate') provides for complete agency discretion in determining whether to even consider—much less grant—a party's IQA request for correction." *Muslim Advocates v. U.S. Dep't of Justice*, 2019 WL 3254230 (N.D. Cal. July 19, 2019); *see also Salt Inst.*, 440 F.3d at 601 ("[t]he language of the IQA," in establishing administrative mechanisms for correction requests while ultimately deferring to the agency's judgment on how to respond, "reflects Congress's intent that any challenges to the quality of information disseminated by federal agencies should take place in administrative proceedings before federal agencies and not in the courts"); *Ams. for Safe*

27

*Access v. HHS*, No. 07-1049, 2007 WL 4168511, at *4 (N.D. Cal. Nov. 20, 2007) (recognizing IQA imposes no legally required duties on agencies but instead vests discretion in agencies to determine how to respond to IQA requests).

NIST's IQA Guidelines similarly recognize NIST's discretion to consider "the costs and benefits of using a higher quality standard or a more extensive review process," and to consider the "resources required" and "the nature and timeliness of the information to be disseminated" when considering what level of transparency or utility is appropriate. NIST Guidelines, Part II (Ex. A at 9). The NIST Guidelines further recognize NIST's discretion in weighing "the importance of the information, its intended use, time sensitivity, expected degree of permanence, relation to the primary mission(s) of the disseminating office, and the context of the dissemination" against "the resources required and time available" when determining what "degree of error" is "acceptable." *Id.* (Ex. A at 10). And NIST may take corrective action in response to an IQA correction request if it deems such action "appropriate." *Id.*, Part III(C)(2) (Ex. A at 17). In other words, neither the IQA nor agency guidelines identify any absolute requirements but instead—as in *Lincoln*—call for a flexible internal assessment of priorities that only the agency could conduct.

Moreover, courts have also consistently recognized that neither the IQA nor agency guidelines provide meaningful standards that a court could apply. *See Muslim Advocates*, 2019 WL 3254230, at *8 (dismissing APA challenge to an agency's response to plaintiff's IQA request and appeal because "neither the IQA nor its implementing guidelines provide judicially manageable standards against which to judge an agency's exercise of discretion in deciding whether to grant an IQA request for correction" (internal quotation omitted)); *Salt Inst. v. Thompson,* 345 F. Supp. 2d 589, 602 (E.D. Va. 2004) ("Neither the IQA nor the OMB Guidelines provide judicially manageable standards that would allow meaningful judicial review to determine

whether an agency properly exercised its discretion in deciding a [correction] request."), *aff'd on other grounds sub nom Salt Inst. v. Leavitt*, 440 F.3d 156 (4th Cir. 2006). The same is true here, in light of the same flexible, discretionary language discussed above.

Nor does Plaintiffs' assertion that the WTC 7 Reports qualify as "influential" information, Compl. ¶ 78, change the analysis. As described above, the discretion to determine whether information qualifies as "influential" is vested in NIST under the OMB and DOC guidelines. OMB guidelines, 67 Fed. Reg. at 8455; DOC Guidelines, 67 Fed. Reg. at 62689. And NIST has determined that, as a non-regulatory agency, it does not typically disseminate information that qualifies as "influential." NIST Guidelines, at 13-14. Plaintiffs cite nothing in the WTC 7 Reports suggesting that NIST designated them as containing "influential" information, nor that the WTC 7 Reports served as a principal basis for a decision by a federal decision-maker, *see* NIST Guidelines at 13. Moreover, NIST retains the same discretion regarding its responses to IQA correction requests regardless of whether a request concerns "influential" information.[5]

### 2.     NIST's Responses to Plaintiffs' IQA Correction Request and Appeal Are Not Final Agency Actions Subject to Judicial Review

Any claim Plaintiffs might bring to NIST's response here would also be unreviewable because NIST's response does not qualify as "final agency action" under 5 U.S.C. § 704. *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.,* 946 F.3d 615, 620 (D.C. Cir. 2020) (recognizing that

---

[5]  Although OMB's 2019 memo provided further guidance regarding the designation of influential information, that guidance was not in effect at the time that the WTC 7 Reports were issued and therefore does not apply to NIST's dissemination of those Reports. *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."). Indeed, the 2019 memo addresses only agencies' IQA guidelines, not specific disseminations of information, and nothing in the 2019 memo suggests an expectation that agencies revise publications disseminated years earlier. Moreover, the NIST Guidelines, which incorporate the guidance in the 2019 memo, continue to indicate that NIST does not typically disseminate influential information. NIST Guidelines at 13-14.

APA claims under § 706(2) must identify a "final agency action" as the subject of their challenge).

Even assuming that an agency's decision in response to an IQA request or appeal might qualify as

an "agency action" under 5 U.S.C. § 551(13), NIST's response here cannot be deemed "final."

Finality in the APA context encompasses two distinct requirements. First, the agency action "must

mark the consummation of the agency's decisionmaking process." *Cal. Cmtys. Against Toxics v.*

*EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

Second, "the action must be one by which rights or obligations have been determined, or from

which legal consequences will flow.'" *Id.* (quoting *Bennett*, 520 U.S. at 177-78).

Other cases, including one in this District, have held that an agency's decision in response

to an IQA correction request was not final agency action because it did not determine any rights

or obligations and had no legal consequence. *See Muslim Advocates*, 2019 WL 3254230, at *12

(holding plaintiff failed to allege "final agency action" where it "point[ed] to no language in either

the IQA or its implementing guidelines suggesting that [agency] IQA determinations implicate a

legal right or obligation for purposes of an APA claim"); *Single Stick, Inc. v. Johanns*, 601 F. Supp.

2d 307, 316–17 (D.D.C. 2009) (holding agency's decision in response to an IQA request or appeal

was not a "final agency action" because it did not "determine [a requester's] rights or cause any

legal consequence"), *aff'd in relevant part on other grounds, Prime Time Int'l Co. v. Vilsack*, 599

F.3d 678 (D.C. Cir. 2010).

The Court here should reach the same conclusion. Plaintiffs could not plausibly identify

anything in NIST's response to their IQA correction request that determined Plaintiffs' rights or

obligations or resulted in legal consequences. Rather, as discussed above, the IQA confers no right

to information or its correction. *Salt Inst.,* 440 F.3d at 159. NIST's response to Plaintiffs' correction

request thus implicates no such right. Moreover, the underlying NIST reports whose correction

Plaintiffs seek also impose no obligations and are expressly excluded from evidentiary use. 15 U.S.C. §§ 7312, 281a. Thus, Counts I-VIII are subject to dismissal under Rule 12(b)(6) on this ground as well.

**B.      Plaintiffs' NCST Act Claim Is Time-Barred and Not Subject to Judicial Review (Count IX)**

In Count IX, Plaintiffs allege that the WTC 7 Reports violate the NCST Act on grounds that mirror the arguments set forth in their IQA correction request. *See* Compl. ¶ 330. They also assert that NIST's "'black box' secrecy" in connection with the WTC 7 Reports and "WTC 7 Probable Collapse Sequence analysis and computer modelling" violates the NCST Act "or at minimum represents an arbitrary and capricious failure to honor the spirit and purpose of the NCST Act." *Id*. ¶ 329. These assertions fail to state a claim.

For one thing, any challenge to the WTC 7 Reports, issued over twelve years ago in 2008, is barred by the six-year statute of limitations in 28 U.S.C. § 2401. *See Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014) (absent an express statutory provision to the contrary, "civil claims against the United States—including those brought pursuant to the APA—are subject to the statute of limitations contained in 28 U.S.C. § 2401"). Section 2401 provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). A "right of action first accrues on the date of the final agency action." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 342 (D.C. Cir. 2018) (internal quotation omitted). Thus, even if the WTC 7 Reports qualified as final agency actions, any APA claims challenging the Reports themselves as arbitrary and capricious must be dismissed as time-barred.

Moreover, like NIST's IQA responses, the WTC 7 Reports also do not qualify as final agency action. As discussed above, APA claims may only challenge final agency action, which is

31

limited to actions that mark the "consummation of the agency's decisionmaking process," "by which rights or obligations [were] determined, or from which legal consequences w[ould] flow." *Bennett*, 520 U.S. at 178. The WTC 7 Reports stand in contrast to the Biological Opinion addressed in *Bennett*, which had "direct and appreciable legal consequences." *Bennett*, 520 U.S. at 178. Rather, the WTC 7 Reports more closely resemble the reports discussed in two other cases, which the Court in *Bennett* distinguished. *See id.* In *Franklin v. Massachusetts,* 505 U.S. 788 (1992), the Court held that a report presented to the President by the Secretary of Commerce, which tabulated the results of the census, was not a "final agency action" because it carried no "direct consequences." *See id.* at 798. And in *Dalton v. Specter,* 511 U.S. 462 (1994), the Court held that a statutorily-required report issued by the Defense Base Closure and Realignment Commission was not "final agency action" because the base closure recommendations that it contained were not binding but purely advisory. *See id.* at 469-71. Numerous other decisions similarly recognize that agency reports, even when statutorily required, do not qualify as final agency action when they simply provide information, results of investigations, or recommendations. *See*, *e.g.*, *Deripaska v. Yellen*, No. 19-CV-00727, 2021 WL 2417425, at *14 (D.D.C. June 13, 2021) (holding Treasury report listing certain individuals as Russian oligarchs was not a final agency action); *Seeger v. U.S. Dep't of Def.,* 306 F. Supp. 3d 265, 288 (D.D.C. 2018) (questioning whether Navy final report could qualify as final agency action when "it is the resulting order [of the Navy], not the preceding study that has a 'direct and immediate . . . effect on the day to day business' of the" plaintiff); *Jefferson v. Harris*, 170 F. Supp. 3d 194, 218 (D.D.C. 2016) (Department of Labor Inspector General report describing results of investigation was not final agency action).

.       The WTC 7 Reports fall squarely within this category of informational reports that do not determine rights or obligations or have any legal consequence. To the extent the WTC 7 Reports

contained recommendations at all, they, like the recommendations in the reports considered in *Franklin* and *Dalton*, were not binding. *See* 15 U.S.C. § 7307. To the contrary, the NCST Act expressly prohibits NIST from "requir[ing] the adoption of building standards, codes, or practices" through such a report. *Id.* § 7312. Count IX fails to state a claim on this basis as well.

In addition, to the extent Count IX asserts that NIST failed to make certain information available, Compl. ¶ 329, such a claim falls outside the scope of an APA claim. The arbitrary and capricious standard in the APA's judicial review provision, 5 U.S.C. § 706(2)(A), addresses an agency's reasoned decisionmaking, not its disclosure of information. *Cf. Toledo Hosp. v. Becerra*, No. 19-CV-3820, 2021 WL 4502052, at *8 (D.D.C. Sept. 30, 2021) (explaining that "[r]easoned decision-making requires that an agency 'articulate a satisfactory explanation for its action' with a 'rational connection between the facts found and the choice made'"). And as noted above, the NCST Act only requires information to be made available on request, where it is not exempt from disclosure under the FOIA and where disclosure has not been found to jeopardize public safety. *See* 15 U.S.C. § 7306. The proper avenue to address such a claim would therefore be through the FOIA, not the APA. *Cf. CREW*, 846 F.3d at 1245–46 (holding APA claims precluded where FOIA provided an adequate alternative remedy). Indeed, such claims have already been raised in FOIA cases—where they were soundly rejected. *Cf. Cole I*, 485 F. Supp. 3d at 252-53; *Cole II*, 2020 WL 7042814, at *5-6; *Quick*, 775 F. Supp. 2d at 180-81.

Finally, Count IX fails to state a claim because it improperly seeks to circumvent the administrative correction scheme set forth under the IQA by raising IQA-based challenges to the WTC 7 Reports themselves. But principles of issue exhaustion prohibit this attempt at circumvention. *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1149–50 (D.C. Cir. 2005) (recognizing that when "the role of the court is to determine

33

whether the agency's decision is arbitrary and capricious for want of reasoned decisionmaking," parties "rarely are allowed to seek 'review' of a substantive claim that has never even been presented to the agency for its consideration"). By Plaintiffs' admission, the arguments set forth in Count IX were raised in Plaintiffs' IQA correction request—not during the process of preparing the WTC 7 Reports themselves. *See, e.g.*, Compl. ¶¶ 86-88 (describing Plaintiffs' IQA correction request), 99-319 (Counts 1-VIII, setting forth eight issues raised in Plaintiffs' IQA correction request, corresponding to the eight issues identified in Compl. ¶ 330). And, as discussed above, judicial review of NIST's responses to that request is unavailable pursuant to 5 U.S.C. § 704 because NIST's compliance with the IQA is a matter that is committed to agency discretion. This bar applies to an equal, if not greater, extent where Plaintiffs seek to bypass the very administrative mechanism through which Congress intended any IQA-related arguments to be made by purporting to challenge the WTC 7 Reports themselves rather than NIST's responses to Plaintiffs' IQA correction request and appeal. Congress's requirement in the IQA that agencies establish administrative mechanisms for consideration of information quality issues, while granting discretion to agencies regarding how to respond, "reflects Congress's intent that any challenges to the quality of information disseminated by federal agencies should take place in administrative proceedings before federal agencies and not in the courts." *Salt Inst.,* 440 F.3d at 601. Plaintiffs' attempt to challenge the WTC 7 Reports directly on IQA-based grounds is thus necessarily precluded as well. For all these reasons, Count IX should be dismissed.

### C.    Plaintiffs' Procedural Claim Fails To Identify a Plausible Procedural Violation Cognizable Under the APA (Count X)

Plaintiffs' final APA claim alleges that NIST's denial of their IQA appeal did not comply with procedural requirements. Compl. ¶¶ 336-339. Plaintiffs identify two requirements that, they say, were not followed in the appeals process. First, Plaintiffs cite Part III(D) of NIST's IQA

Guidelines, stating that "No individuals who were involved in the initial denial [of an IQA correction request] will be involved in the review of or response to the appeal." *See* NIST Guidelines, Part III(D)(3) (Ex. A at 19); Compl. ¶¶ 336-337. Second, Plaintiffs cite Part III(C) of NIST's IQA Guidelines, which states that initial decisions responding to IQA correction requests "will contain a point-by-point response to any relevant data quality arguments contained in the request." *See* NIST Guidelines, Part III(C)(3) (Ex. A at 18); Compl. ¶ 338. Part III(C)(3) plainly addresses initial decisions rather than appeals. *Compar*e NIST Guidelines, Part III(C) (addressing initial decisions), *with id.*, Part III(D) (addressing appeals). Plaintiffs nevertheless assert that NIST violated this requirement by failing to include a point-by-point response in its decision on Plaintiffs' appeal. *See* Compl. ¶ 339. Plaintiffs' assertions that these provisions were violated fail to set forth a claim upon which relief may be granted.

For one thing, Count X asserts a claim under the APA, Compl. ¶ 334, and Plaintiffs therefore remain bound by the APA's final agency action requirement. *See C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 226 (D.D.C. 2020) (affirming APA's "final agency action" requirement applies where plaintiffs claim agency has not followed its own procedural requirements). As explained above, NIST's responses to Plaintiffs' IQA correction request and appeal do not qualify as final agency actions. *See Muslim Advocates*, 2019 WL 3254230, at *12; *Single Stick, Inc.*, 601 F. Supp. 2d at 316–17. Count X may be dismissed on this basis alone.

In addition, the administrative procedures set forth in NIST's IQA Guidelines are not designed to protect any individual due process right of those submitting IQA correction requests. After all, the IQA does not create any right to information or the correction thereof. *Salt Inst.,* 440 F.3d at 159. Rather, the procedures simply reflect NIST's determination of how best to ensure its compliance with the IQA—a matter that falls within NIST's own discretion, as described above.

35

In situations where individual rights are not at issue, an agency retains considerable discretion "'to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it.'" *Am. Waterways Operators v. Wheeler*, 507 F. Supp. 3d 47, 71 (D.D.C. 2020) (quoting *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970)). In *American Waterways*, the court rejected the plaintiffs' claim that EPA had failed to follow its own procedures when authorizing the State of Washington to designate Puget Sound a "No Discharge Zone" because that determination did not "adjudicate the individual rights" of the organizational plaintiff's members, and the plaintiff failed to make a "showing of substantial prejudice" resulting from the alleged procedural violation. *See id.* at 72. Here, Plaintiffs make no attempt to identify any prejudice—much less substantial prejudice—resulting from the procedural violations that they allege. The Complaint on its face therefore fails to state a claim on this basis.

Moreover, although Plaintiffs baldly assert that such procedural violations have occurred, their assertions are unsupported by any facts set forth in their Complaint. Plaintiffs therefore fail to meet the plausibility standard of *Iqbal*. *Iqbal*, 556 U.S. at 678 ("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" (internal quotation omitted)). Indeed, with respect to their point-by-point response claim, Plaintiffs rely on a section of NIST's IQA Guidelines, Part III(C), that on its face is inapplicable to NIST's decision on their appeal, which is the only decision they challenge on procedural grounds. Compl. ¶¶ 338-39. Rather, Part III(C) applies only to initial decisions, and Plaintiffs never suggest that NIST's initial decision failed to comply with that requirement. *See id.*

Plaintiffs' assertions are also belied by NIST's responses to their IQA request and appeal. Plaintiff AE has published those responses on its website, and the responses are incorporated by reference in Plaintiffs' Complaint. The Court may therefore consider these responses for purposes

of evaluating whether Count X states a claim. *Slovinec*, 268 F. Supp. 3d at 59. NIST's initial decision responding to Plaintiffs' IQA correction request plainly addresses Plaintiffs' argument in a point-by-point manner. *See* NIST Initial Decision, at 2-10. In its decision on appeal, NIST concluded that those point-by-point responses were sound. NIST Response to IQA Appeal, at 3. NIST's IQA Guidelines require nothing more. *See* NIST Guidelines, Part III(D) (Ex. A at 18-19). In addition, NIST's response to Plaintiffs' IQA appeal plainly states that "no individuals who were involved in the Initial Decision were involved in the review of or preparation of this response to the Appeal. The review on appeal was entirely independent and comprised by a completely new set of individuals in all aspects including technical, administrative, or otherwise." NIST Response to Appeal, at 2. Count X thus fails to state a claim upon which relief may be granted and should be dismissed on this basis as well.

## CONCLUSION

For the foregoing reasons, this case should be dismissed in its entirety with prejudice and without leave to amend.

December 23, 2021      Respectfully submitted,

            BRIAN M. BOYNTON
            Acting Assistant Attorney General

            MARCIA BERMAN
            Assistant Director, Federal Programs Branch

            */s/ Kathryn L. Wyer*
            KATHRYN L. WYER
            Federal Programs Branch
            U.S. Department of Justice, Civil Division
            1100 L Street, N.W., Room 12014
            Washington, DC   20005
            Tel. (202) 616-8475
            kathryn.wyer@usdoj.gov
            *Attorneys for Defendants*