**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
ARCHITECTS & ENGINEERS FOR 9/11 TRUTH, et al.,  )
                                                          )
        Plaintiffs,                                       )
                                                          )
        v.                                                )  No. 1:21-cv-2365-TNM
                                                          )
GINA M. RAIMONDO, in her official capacity as             )
Secretary of Commerce, et al.                             )
                                                          )
        Defendants.                                       )
_____)

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Mick G. Harrison, Attorney at Law (Pro Hac Vice)
Pennsylvania Bar No. 65002
520 S. Walnut Street, #1147
Bloomington, IN  47402
Phone: 812-361-6220
Fax: 812-233-3135
E-mail: mickharrisonesq@gmail.com

John M. Clifford, D.C. Bar No. 191866
Clifford & Garde, LLP
815 Black Lives Matter Plaza, NW,
Washington, D.C. 20006
Tel. 202.280.6115
jclifford@cliffordgarde.com

Attorneys of Record for all Plaintiffs.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .          .          .          .          .          .          iii

I.      INTRODUCTION          .          .          .          .          .          .          .          1

II.     FACTUAL BACKGROUND.          .          .          .          .          .          3

III.    STATUTORY AND REGULATORY BACKGROUND          .          .          5

        A.      The Information Quality Act .          .          .          .          .          5

        B.      The NCST Act          .          .          .          .          .          .          9

IV.     PROCEDURAL BACKGROUND          .          .          .          .          .          10

V.      STANDARD OF REVIEW .          .          .          .          .          .          10

VI.     ARGUMENT .          .          .          .          .          .          .          .          11

        A.      Plaintiffs Have Informational Standing          .          .          .          11

                1.      Plaintiffs Have Suffered Informational Injury          .          11

                2.      Defendants' Actions Caused Plaintiffs' Injury          .          18

                3.      The Relief Sought Will Redress Plaintiffs' Injury          .          22

        B.      Plaintiff Architects & Engineers Has Organizational Standing          23

                1.      Plaintiff AE Has Suffered Organizational Injury          .          23

                2.      Defendants' Violations Caused AE's Organizational Injury          30

                3.      The Relief Sought Will Redress AE's Injury .          .          31

        C.      Plaintiffs State Claims Upon Which Relief Can Be Granted .          32

                1.      Plaintiffs' IQA Claims Are Subject to Judicial Review          32

                2.      Plaintiffs' NCST Act Claim Is Reviewable and Not Timely          36

                3.      Plaintiffs State an APA Procedural Claim          .          .          40

CONCLUSION          .          .          .          .          .          .          .          .          42

# TABLE OF AUTHORITIES

## Cases

*American Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*,
659 F.3d 13 (D.C. Cir. 2011) .          .          .          .          .          .          13, 21, 22, 31

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) .          .          .          .          29

*Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986)   .          39

*District of Columbia v. Trump*, 291 F.Supp.3d 725 (D. Md. 2018)   .          .          29

*Electronic Privacy Information Center v. Presidential Advisory Commission
on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017).          .          .          12, 14, 30, 31

*Equal Rights Ctr. v. Post Properties, Inc.,* 633 F.3d 1136 (D.C. Cir. 2011) .          32

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)          .          .          .          23

*FEC v. Akins*, 524 U.S. 11 (1998)   .          .          .          .          .          .          11-12

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015)          .          .          .          .          11, 18-19, 24-25

*Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016)          .          .          12

*Hardin v. Kentucky Utilities Co.*, 390 U.S. 1 (1968) .          .          .          .          15

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)          .          .          26-27, 31

*Holmberg v. Armbrecht*, 327 U.S. 392 (1946)          .          .          .          .          38

*In Linda R.S. v. Richard D.*, 410 U.S. 614 (1973)          .          .          .          .          15

*In re Grand Jury Application*, 617 F. Supp. 199 (S.D.N.Y. 1985)   .          .          15

*Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26 (D.D.C. 2020),
affd, 848 F. App'x 428 (D.C. Cir. 2021), cert. denied, No. 21-93,
2021 WL 4508610 (U.S. Oct. 4, 2021)          .          .          .          .          .          16-17

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)          .          .          32

*Leedom v. Kyne*, 358 U.S. 184 (1958)          .          .          .          .          .          39

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) .          .          .          .          15, 28

*Nat'l Ass'n for Advancement of Colored People v. United States Postal Serv.,
496 F. Supp. 3d 1, 12 (D.D.C. 2020), enforcement granted,
No. 20-CV-2295 (EGS), 2020 WL 6441317 (D.D.C. Oct. 27, 2020),
and appeal dismissed, No. 20-5375, 2021 WL 672392
(D.C. Cir. Feb. 10, 2021)     .         .         .         .         .         .         25-26, 40

Nat'l Ass'n of Home Builders v. EPA, 667 F.3d 6 (D.C. Cir. 2011)   .         .         26

Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428 (D.C. Cir. 1995)     26

*People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture,
797 F.3d 1087 (2015) .         .         .         .         .         .         .         .         18-19

*Prime Time Intern. Co. v. Vilsack, 599 F.3d 678 (D.C. Cir. 2010) .         2, 32-36

Public Citizen v. U.S. Dep't of Justice, 491 U.S. 440 (1989) .         .         .         11-12

Salmon Spawning & Recovery Alliance v. Gutierrez,
545 F.3d 1220 (9th Cir. 2008)         .         .         .         .         .         .         41

Sargeant v. Dixon, 130 F.3d 1067 (1997)     .         .         .         .         .         27-28

Sierra Club v. Morton, 405 U.S. 727 (1972) .         .         .         .         .         32

Single Stick, Inc. v. Johanns, 601 F. Supp. 2d 307 (D.D.C. 2009),
aff'd on other grounds, Prime Time Int'l Co. v. Vilsack,
599 F.3d 678 (D.C. Cir. 2010)         .         .         .         .         .         .         36, 41

Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205 (1972)         .         .         15

Vermont Agency of Nat. Res. v. United States ex rel. Stevens,
529 U.S. 765 (2000)   .         .         .         .         .         .         .         .         29

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977)     23

*Warth v. Seldin, 422 U.S. 490 (1975)         .         .         .         .         .         15, 29

Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.,
485 F. Supp. 3d 1, 19 (D.D.C. 2020), appeal dismissed sub nom.
Whitman-Walker Clinic, Inc. v. United States Dep't of Health & Hum. Servs.,
No. 20-5331, 2021 WL 5537747 (D.C. Cir. Nov. 19, 2021) .         .         .         20-21

Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193 (4th Cir. 2017)         .         29

*Williams v. Conner*, 522 F. Supp. 2d 92 (D.D.C. 2007)     .          .          .          36

**Statutes and Rules**

*Administrative Procedures Act (APA), 5 U.S.C. §§ 701-706     .          1, 40-42

*Informational Quality Act (IQA) (aka Data Quality Act),
Section 515 of Public Law 106-554, 44 U.S.C. § 3516, note .     1, 2, 5, 32-36, 40-41

*National Construction Safety Team Act (NCST Act), Pub. Law 107-231,
15 U.S.C. § 7301 et seq.     .          .          .          .          .          1, 2, 9, 13, 37-38

28 U.S.C. § 2401     .          .          .          .          .          .          .          .          36

Fed. R. Civ. P. 12(b)(1)     .          .          .          .          .          .          .          10

Fed. R. Civ. P. 12(b)(6)     .          .          .          .          .          .          .          10

Fed. R. Civ. P. 15     .          .          .          .          .          .          .          .          2

**Regulations and Federal Register**

OMB IQA Proposed Guidelines, 66 Fed.Reg. 34489.     .          .          .          5-7

OMB IQA updated final Guidelines, February 22, 2002, 67 Fed.Reg. 8452 .     5-8

## I.    INTRODUCTION

In Plaintiffs First Amended Complaint (FAC), Plaintiffs present ten claims for declaratory and injunctive relief under the Administrative Procedures Act (APA), the Informational Quality Act (IQA) (aka Data Quality Act), and the National Construction Safety Team Act (NCST Act). This Complaint was filed by eight family members of people killed on September 11, 2001, by ten architects and structural engineers, and by the nonprofit organization Architects & Engineers for 9/11 Truth, Inc. ("Plaintiffs").

This Complaint concerns actions contrary to law, and arbitrary and capricious actions, taken by the federal agency National Institute of Standards and Technology (NIST) during the conduct of and reporting of results from a study of the collapse of World Trade Center Building 7 (WTC 7) on the day of the September 11, 2001, terrorist attacks in New York City, and NIST's actions in denying Plaintiffs' Request for Correction (RFC) and administrative appeal under the IQA regarding NIST's WTC 7 Report.[1]

Contrary to Defendant NIST's assertions in support of its Motion to Dismiss, Plaintiffs' claims should not be dismissed. Plaintiffs have informational standing, Plaintiff Architects & Engineers for 9/11 Truth (AE) has organizational standing, and Plaintiffs have sufficiently demonstrated their standing at this motion to dismiss stage of the litigation. Further, Plaintiffs in their FAC adequately state their claims under the APA, the IQA, and the NCST Act.

---

[1] NIST's Final Report on the Collapse of the World Trade Center Building 7 (NIST report NCSTAR 1A) and NIST's Fire Response and Probable Collapse Sequence of World Trade Center Building 7 (NIST report NCSTAR 1-9), together with NIST's publicly posted FAQs regarding these reports, are collectively referred to herein as the "WTC 7 Report."

Plaintiffs have a substantive right to information under the NCST Act which requires issuance of a public report by Defendant NIST regarding the likely technical cause of the collapse of WTC 7, and under the IQA which requires agencies to comply with certain informational quality standards. The IQA allows affected persons to seek correction of disseminated information directly from an agency, and Plaintiffs exercised that statutory right before the agency.

The IQA standards established by Congress, the Office of Management and Budget (OMB), and NIST itself, and the standards for judicial review under the APA, provide the courts sufficient standards to apply to allow for judicial review. Contrary to Defendants' assertion (which is based on non-binding decisions from district courts and other Circuits) that every court presented with an IQA claim to date has rejected such claim as unreviewable, Plaintiffs' IQA claims *are* judicially reviewable, as reflected in the decision of the D.C. Circuit in *Prime Time Intern. Co. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010).

Should the Court grant Defendants' motion to dismiss, the dismissal should not be with prejudice without leave to amend as Defendants prematurely request. Plaintiffs have amended only once, their amendment as of right, and in the event the Court decides to grant Defendant's instant motion to dismiss, the Court should reserve judgment as to whether Plaintiffs should be allowed a first amendment with leave of court given the policy clearly expressed in Fed. R. Civ. P. 15 that leave to amend is to be freely given as justice so requires.

## II.      FACTUAL BACKGROUND

The horrendous attacks of September 11, 2001 (9/11) were the worst attacks on American soil since Pearl Harbor, and perhaps the worst such attacks in the history of the United States. It is well known that on 9/11, on the morning of the terrorist attacks in New York City, the two World Trade Center (WTC) towers (WTC 1 and WTC 2) completely and rapidly collapsed, resulting in the tragic deaths of over two thousand people, including first responders and citizens working in and visiting the WTC. This rapid collapse of WTC 1 and WTC 2 exacerbated the already tragic loss of the passengers and crews on the hijacked aircraft. What is less well known is that also on 9/11 a third WTC high-rise building, WTC 7, 47 stories high, completely collapsed, much later in the day, without having been struck by an aircraft.

WTC 7's collapse was rapid, symmetrical, and in every respect appeared to be a controlled demolition. FAC ¶¶ 112-113, 191, 218-233, 269, 271-273, 279, 300. There were also reports on 9/11 from witnesses that there were explosions in WTC 7 prior to and at the time of its collapse.

The National Institute of Standards and Technology (NIST) was charged with investigating and reporting the cause of WTC 7's collapse. NIST in November 2008 issued its findings and conclusions regarding the collapse of WTC 7 in its WTC 7 Report. NIST, through the NIST WTC 7 Report and the NIST WTC 7 FAQs, disseminated inaccurate, unreliable, and biased information about the collapse of the WTC 7, ignoring the abundant evidence of the use of explosives (in a controlled demolition), and misrepresenting to the public that WTC 7's collapse was due entirely to fires in the building. NIST's WTC 7 Report was based on purported computer modelling of WTC

7's collapse but NIST refused to release its computer modelling to the public or independent scientists for attempts at verification and replication.

NIST's conclusion -- that fires initiated by debris damage from the collapse of one of the WTC towers, the North Tower, WTC 1, caused the collapse of WTC 7 -- was simply incompatible with the then-available, and now-available, scientific and witness evidence. Plaintiffs submitted to NIST, via their Request for Correction (RFC) under the IQA, a scientifically and logically irrefutable case based on careful documentation of dispositive evidence clearly showing that the NIST WTC 7 Report's conclusion and rationale -- that the collapse of WTC 7 on 9/11 was due to fires and not the use of explosives and incendiaries -- was more than just wrong, it was factually inaccurate, methodologically unreliable, scientifically unsound, illogical, and biased.

Some of the Plaintiffs are family members of those who died in the 9/11 attacks at the WTC, and some are professional architects and engineers. Plaintiff Architects & Engineers for 9/11 Truth (AE) is a non-profit organization, incorporated in California. Since its founding in 2006, AE has conducted an independent, multi-year scientific investigation into the causes of the destruction of World Trade Center Building 7 (WTC 7) as well as the destruction of the World Trade Center Twin Towers (WTC 1 and 2). FAC ¶¶ 9-26; Exhibit 1, Declaration of Roland Angle, President and Chief Executive Officer of AE.

NIST's violations of the IQA, the OMB Guidelines, and NIST's Information Quality Standards (IQS) significantly and adversely affect Plaintiffs. Exhibit 1, Declaration of Roland Angle; Exhibit 2, Declaration of Robert McILvaine; and Exhibit 3, Declaration of Ronald Brookman. *And see, e.g.,* FAC ¶¶ 9-26; FAC ¶¶ 41-49; FAC ¶¶

55-67.

### III.   STATUTORY AND REGULATORY BACKGROUND

#### A.   The Information Quality Act

Section 515 of Public Law 106-554 is commonly known as the Data Quality Act or Information Quality Act. The IQA, enacted in 2000, provides that the Director of the OMB shall, with public and federal agency involvement, issue guidelines under sections 3504(d)(1) and 3516 of title 44, United States Code, that provide policy and procedural guidance to federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information disseminated by federal agencies in fulfillment of the purposes and provisions of the Paperwork Reduction Act. 44 U.S.C. § 3516, note.

The IQA required OMB's Guidelines to direct each Federal agency to which the guidelines apply to issue agency specific guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information disseminated by such agency.

The IQA also required OMB's Guidelines to direct each Federal agency to establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the OMB and agency information quality guidelines.

The OMB, pursuant to the IQA, issued government-wide Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies ("OMB Guidelines"). On June 28, 2001, the OMB issued its proposed guidelines implementing the IQA and requesting public comment. 66 Fed.Reg. 34489. OMB issued its updated final guidelines on February 22, 2002. 67 Fed.Reg. 8452.

The OMB guidelines require agencies to "adopt a basic standard of quality (including objectivity, utility, and integrity) as a performance goal," including "specific standards of quality that are appropriate for the various categories of information they disseminate." 67 Fed.Reg. 8458–59. "Quality is to be ensured and established at levels appropriate to the nature and timeliness of the information to be disseminated." *Id*. at 8458.

The OMB Guidelines state that "'Objectivity' includes whether disseminated information is being presented in an accurate, clear, complete, and unbiased manner." *Id*. at 8460.

The OMB Guidelines also require that agencies provide "administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines." *Id*. at 8459.

The OMB commentary provided when the OMB Guidelines were published states, in regard to an agency's administrative mechanism allowing affected persons to seek and obtain timely correction of information, that "an objective process will ensure that the office that originally disseminates the information does not have responsibility for both the initial response and resolution of a disagreement." *Id*. at 8458.

NIST in turn, pursuant to the IQA and the OMB Guidelines, issued its own "Guidelines, Information Quality Standards, and Administrative Mechanism" ("NIST IQS").

The NIST IQS define "information" as follows:

> Information means any communication or representation of knowledge such as facts or data, in any medium or form, including

6

textual, numerical, graphic, cartographic, narrative, or audiovisual forms. This definition includes information that an agency disseminates from a Web page but does not include the provision of hyperlinks to information that others disseminate. This definition does not include opinions, where the agency's presentation makes it clear that what is being offered is someone's opinion rather than fact or the agency's views.

The NIST IQS defines "dissemination" as follows:

Dissemination means agency initiated or sponsored distribution of information to the public. Dissemination does not include distribution limited to government employees or agency contractors or grantees; intra- or inter-agency use or sharing of government information; and responses to requests for agency records under the Freedom of Information Act, the Privacy Act, the Federal Advisory Committee Act or other similar law. This definition also does not include distribution limited to correspondence with individuals or persons, press releases, archival records, public filings, subpoenas or adjudicative processes.

Under the OMB Guidelines and the NIST IQS, information quality comprises three elements: utility, integrity, and objectivity.

"Utility" under the NIST IQS means that the information is "useful to its intended users." The term "useful," in turn, means that the information is "helpful, beneficial, or serviceable to its intended users." The NIST IQS further provides that "Where the usefulness of information will be enhanced by greater transparency, care is taken that sufficient background and detail are available, either with the disseminated information or through other means, to maximize the usefulness of the information. The level of such background and detail is commensurate with the importance of the particular information, balanced against the resources required, and is appropriate to the nature and timeliness of the information to be disseminated."

"Integrity" under the NIST IQS means that before information is disseminated by

NIST, it is "safeguarded from improper access, modification, or destruction." Furthermore, the integrity of information is protected "to a degree commensurate with the risk and magnitude of harm that could result from the loss, misuse, or unauthorized access to or modification of such information."

"Objectivity" under the NIST IQS means that the information is "accurate, reliable, and unbiased." Moreover, "objective" information is "presented in an accurate, clear, complete, and unbiased manner." In the case of scientific information, "the original and supporting data are generated, and the analytic results are developed, using sound statistical and research methods."

The OMB Guidelines and the NIST IQS apply stricter quality standards to the dissemination of information that is considered "influential." The OMB Guidelines define as "influential" information that "will have or does have a clear and substantial impact on important public policies or important private sector decisions." The NIST IQS defines "influential" similarly.

Regarding influential scientific information and analytic results related thereto, the OMB Guidelines dictate that "agency guidelines shall generally require sufficient transparency about data and methods that an independent reanalysis could be undertaken by a qualified member of the public." *See* 67 F.R. 8460. Citing OMB Guidelines, the NIST IQS states that "agency guidelines shall include a high degree of transparency about data and methods to facilitate the reproducibility of such information by qualified third parties."

"Reproducibility" under the NIST IQS means that the information is "capable of being substantially reproduced, subject to an acceptable degree of imprecision. For

information judged to have more (less) important impacts, the degree of imprecision that is tolerated is reduced (increased)." The NIST IQS states that "With respect to analytic results, 'capable of being substantially reproduced' means that independent analysis of the original or supporting data using identical methods would generate similar analytic results, subject to an acceptable degree of imprecision or error." *Id*. In other words, if independent analysis of the original or supporting data using identical methods does not generate similar analytic results, the disseminated information does not meet the reproducibility standard imposed on "influential" information.

### B.  The NCST Act

NIST was required by law to generate the NIST WTC 7 Report under the NCST Act (Pub. Law 107-231, 15 U.S.C. § 7301 et seq.). The NCST Act, 15 U.S.C. § 7307, mandates the issuance of a final public report following a NIST investigation of a building collapse subject to the Act.

The NCST Act, as Defendants note, authorizes NIST to establish and deploy a National Construction Safety Team, after a building collapse "that has resulted in substantial loss of life or that posed significant potential for substantial loss of life," in order to investigate the likely cause or causes of the collapse. 15 U.S.C. § 7301(a)-(b). Following such an investigation, a Team must issue a public report that includes "an analysis of the likely technical cause or causes of the building failure investigated." *Id*. § 7307.

## IV.    PROCEDURAL BACKGROUND

Plaintiffs submitted their RFC under the IQA to NIST on April 15, 2020, asserting *inter alia* that NIST violated NIST's IQS requirements of objectivity, utility, transparency, and reproducibility.

The Initial Decision by NIST denying Plaintiffs' RFC was issued on August 28, 2020. Plaintiffs' administrative Appeal of the Initial Decision Regarding the Request for Correction to NIST's Final Report on the Collapse of World Trade Center Building 7 (Information Quality #20-01) was submitted to NIST on September 28, 2020.

Plaintiffs submitted to NIST on June 1, 2021, a Request for Issuance of Final Decision, and Alternative Notice of Intent to Sue due to NIST's eight-month delay in deciding Plaintiffs' Appeal. On June 30, 2021, NIST issued its decision denying Plaintiffs' administrative Appeal of NIST's denial of Plaintiffs' RFC.

All the Plaintiffs were Requestors in the RFC submitted to NIST under the IQA and were parties to the subsequent administrative appeal of NIST's denial of that RFC.

On September 7, 2021, Plaintiffs initiated the instant action in this Court. On January 31, 2022, Plaintiffs filed their FAC. On March 11, 2022, Defendants filed their Motion to Dismiss Plaintiffs' FAC. Plaintiffs now, hereby, respond to Defendants' Motion to Dismiss.

## V.    STANDARD OF REVIEW

Plaintiffs agree with the statement of the standard of review governing motions to dismiss under Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6) in Defendants' Memorandum in Support of Defendants' Motion to Dismiss, p. 15. Plaintiffs would note that in addition to the federal courts' obligation to avoid deciding a matter for which the

10

federal courts lack subject matter jurisdiction, the federal courts also have the corresponding obligation to accept jurisdiction and decide a matter that is within the federal courts' subject matter jurisdiction.

## VI.   ARGUMENT

### A.   Plaintiffs Have Informational Standing

#### 1.   Plaintiffs Have Suffered Informational Injury

Contrary to Defendants' assertions in their Memorandum in Support of Motion to Dismiss (Def. Mem.) at 18-25, all of the Plaintiffs here satisfy the requirements for informational standing. The D.C. Circuit has explained the nature of the burden on plaintiffs to establish standing, generally.

> To establish standing, Plaintiffs "must state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C.Cir.2015). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Bennett*, 520 U.S. at 168, 117 S.Ct. 1154 (internal quotation marks omitted).

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

The Supreme Court has explained that a plaintiff "suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998); see also *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) (finding that failure to obtain information subject to disclosure under Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue").

The D.C. Circuit has explained that informational standing may arise from

11

circumstances where a denial of access to information works an injury to the plaintiff.

> Following *FEC v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), "we have recognized that a denial of access to information can," in certain circumstances, "work an 'injury in fact' for standing purposes," *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 22 (D.C. Cir. 2011) (Feld) (internal quotation omitted). To carry its burden of demonstrating a "sufficiently concrete and particularized informational injury," **the plaintiff must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it,** and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016); see *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1549, 194 L.Ed.2d 635 (2016) ("judgment of Congress" is "important" to "whether an intangible harm," including informational harm, "constitutes injury in fact").

*Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (emphasis added). *Also See, Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998); *Public Citizen v. Dep't of Justice*, 491 U.S. 440 (1989); *Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016).

It is important to note for purposes of a standing decision to be made at the motion to dismiss stage, as Defendants seek here, that the legal standard adopted by the D.C. Circuit, as reflected in the emphasized portion of the quote from *Electronic Privacy Information Center* immediately above, requires the deciding court to adopt the *Plaintiffs'* interpretation regarding information the statute in question requires the government to disclose to them. *Id*.

> **Injury in fact is the denial of information he believes the law entitles him to.**"). **To establish such an injury, a plaintiff must espouse a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain.** In *Akins*, for example, the plaintiffs challenged the Federal Election Commission's determination that the American Israel Public Affairs Committee (AIPAC) was not a "political committee" as defined by the Federal Election Campaign Act (FECA) and therefore not

subject to FECA's disclosure requirements. *Akins*, 524 U.S. at 13, 118 S.Ct. 1777. **Under plaintiffs' contrary view of the law**—that AIPAC's activities rendered it a " political committee"—AIPAC would be required to disclose information about its donors and contributions, information that plaintiffs would have a right to obtain. *See id*. at 21, 118 S.Ct. 1777 (**"The 'injury in fact' that respondents have suffered consists of their inability to obtain information—lists of AIPAC donors ... and campaign-related contributions and expenditures—that, on respondents' view of the law, the statute requires that AIPAC make public."**). **Because of this, the Supreme Court held, plaintiffs had informational standing to challenge the agency's decision**. Were plaintiffs to prevail, AIPAC would have to disclose the information they sought. Similarly, in *Judicial Watch, Inc. v. U.S. Department of Commerce*, the plaintiff alleged that the Department violated the Federal Advisory Committee Act (FACA) reporting requirements by failing to disclose information about its meetings with the North American Competitiveness Council. 583 F.3d 871, 872–73 (D.C.Cir.2009). Much as in *Akins*, under the plaintiff's view of the law—that the North American Competitiveness Council and its subgroups qualified as "advisory committees" under FACA—the Department would be "subject to an array of FACA obligations" to disclose information about its meetings. *Id*. at 873. Because plaintiff would have a right to this information, we held that it had standing to sue the Department for reporting violations.

*American Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 22-23 (D.C. Cir. 2011) (emphasis added).

Defendants want this Court to adopt a rule that would deem, for purposes of the standing analysis here, that Defendants complied with the NCST Act and IQA in regard to information required to be made public because in *Defendants' view* the NCST Act required only that a report be issued by NIST (even if scientifically and factually vacuous or even intentionally fraudulent), see Def. Mem. at 23-25, and in *Defendants' view* the IQA is so discretionary that NIST could have blatantly violated its own and OMB's information quality standards (and, again, issued a report that was scientifically and factually vacuous or even intentionally fraudulent) and there would be no informational injury to the 9/11 family member plaintiffs or the architects and engineers plaintiffs

because they were entitled to no information and not even entitled to have information issued from a government agency not be designed to intentionally mislead them. Def. Mem. at 18-25. But it is not *Defendants' view* of what information a statute requires an agency to publicly report that matters under the rule established in this Circuit for deciding informational standing, it is the *Plaintiff's view*. *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017).

Plaintiff Architects & Engineers for 9/11 Truth (AE) is a non-profit organization that has conducted an independent multi-year scientific investigation of the causes of the collapse of the WTC towers and WTC Building 7 on 9/11. Exhibit 1, Declaration of AE CEO Roland Angle. AE's mission includes investigation and education of the public as to the true reasons these WTC buildings collapsed on 9/11. *Id*. AE has had to make extraordinary efforts over 12 years and engage in extraordinary expenditures of more than $300,000 to combat the misinformation in NIST's WTC 7 Report. *Id*.; FAC ¶¶ 9-26. Plaintiff Robert McILvaine is a 9/11 family member whose son Bobby was killed at the WTC on 9/11. FAC ¶¶ 41-49. Plaintiff Ronald Brookman is a professional engineer who has spent years investigating the collapse of WTC 7 in significant part due to his professional ethical responsibilities. FAC ¶¶ 55-67. The facts explicated in the FAC and in the attached declarations, Exhibits 1-3, establish the necessary factual basis for Plaintiffs' informational standing.

AE also has informational standing here because, in Plaintiffs' view, the NCST Act which requires NIST to issue a public report on the likely technical cause of WTC 7's collapse, is one of those statutes that creates a right the invasion of which creates

standing.

> "Congress may enact statutes creating legal rights, the invasion of which
> creates standing, even though no injury would exist without the statute. …
> 18 U.S.C. § 3332(a) creates a duty on the part of the United States
> Attorney that runs to the plaintiffs, and the breach of that duty gives the
> plaintiffs standing to seek its enforcement." [footnote omitted]

*In re Grand Jury Application*, 617 F. Supp. 199, 201 (S.D.N.Y. 1985). *And see, In Linda
R.S. v. Richard D.*, 410 U.S. 614, 617 n. 3 (1973); *Warth v. Seldin*, 422 U.S. 490, 500
(1975); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 212 (1972) (White, J.,
concurring); *Hardin v. Kentucky Utilities Co.*, 390 U.S. 1, 6 (1968).

To invoke the jurisdiction of an Article III court, the plaintiffs "must have
suffered an 'injury in fact.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).
But the injury "required by Art. III may exist solely by virtue of statutes creating legal
rights, the invasion of which creates standing." *Id.* at 578 (quoting *Warth v. Seldin,* 422
U.S. 490, 500 (1975)).

It should be noted here that the Defendants argument that Plaintiffs are untimely
in challenging NIST's non-compliance with the NCST Act requirement for NIST to issue
a public report, see Def. Mem. at 38-40, has no relevance to the question Plaintiffs'
standing, and no application to whether Plaintiffs have stated a claim on their APA and
IQA counts. That Defendants' SOL argument is only relevant to whether Plaintiffs have
stated a claim in their NCST Act violation count. But even if Plaintiffs err in their
assertion of tolling of that SOL based on fraudulent concealment, the NCST Act can still
serve as a basis for an informational injury for standing purposes here.

The NCST Act requires NIST to issue a public report on the likely technical cause
of WTC 7's collapse. FAC ¶¶ 347-348. Plaintiffs assert that that WTC 7 Report issued by

NIST in 2008 was at best an unscientific sham, and likely fraudulent, FAC ¶¶ 355-358, and that NIST's misconduct in issuing such a report denied AE and the other plaintiffs critically important information affecting their individual and organizational interests. Even if Plaintiffs were late in challenging the NIST actions on the WTC 7 Report as a violation of the NCST Act, Plaintiffs were not late in bringing their RFC and administrative appeal under the IQA to get that NIST WTC 7 Report corrected, a report to which they and the public had a statutory right whether or not they sued NIST within an applicable SOL.

Defendants' arguments rely heavily on the assertion that the IQA does not impose any mandatory duties on NIST to provide information to Plaintiffs. Def. Mem. at 18-25. Whether or not that is true, the NCST Act still imposes a mandatory duty on NIST to issue a public report on the likely technical cause of WTC 7's collapse which gives Plaintiffs an informational interest that supplies the basis for Plaintiffs' standing to challenge NIST's IQA related actions not only as violations of the IQA but as arbitrary and capricious actions under the APA (even if Plaintiffs turn out to be in error on their asserted claims).

This Court, in *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26 (D.D.C. 2020), affd, 848 F. App'x 428 (D.C. Cir. 2021), cert. denied, No. 21-93, 2021 WL 4508610 (U.S. Oct. 4, 2021), a decision on which Defendants significantly rely, noted the significance, for informational standing, of whether the statute at issue actually imposes a duty on the agency to issue a public report. This Court held that if there had been a reporting requirement in the Act of Congress at issue there (an appropriations bill), then Plaintiff Robert McILvaine, father of Bobby McILvaine who perished at the

16

World Trade Center on 9/11, may have had informational standing.

> For example, if Congress had required the FBI to report on new evidence, perhaps the goal would have been to mitigate the suffering of survivors like McIlvaine. But Congress did not require the disclosure of any information, so Plaintiffs cannot show informational injury.

*Id*. at 32. Here, however, even the Defendants acknowledge that the NCST Act requires NIST to issue a public report on the likely technical cause of the collapse of WTC 7.

The individual plaintiffs such as Ronald Brookman who are licensed engineers or architects have suffered a special information injury as a result of NIST's IQA and NCST Act violations. *See* Exhibit 3, Declaration of Ronald Brookman. As engineer Brookman notes in his declaration, he has studied the World Trade Center (WTC) tragedy extensively since 2007, with a primary focus on the structural aspects of WTC 7 since the final NIST reports NCSTAR lA, 1-9 and 1-9A were released in 2008. NIST was responsible for establishing the likely cause of the building failure. *Id*.

Licensed professional engineers are charged with safeguarding life, health, property and public welfare. *Id*. Mr. Brookman takes this obligation seriously and has thus dedicated countless hours to understanding the failure of WTC 7. *Id*.

Mr. Brookman's review has caused him to conclude that the NIST WTC 7 Report authors cannot justify the assumption that collapse initiation resulted from the flange bending and lateral walk-off failure of girder A2001 at column 79 as NIST reported. *Id*. NIST has provided incomplete and misleading responses -- or no responses -- to serious technical inquiries regarding this failure mechanism. *Id.*

Detailed independent analyses conducted and reported by researchers at the University of Alaska Fairbanks (UAF) under the direction of Professor Leroy Hulsey ("UAF Report" or "UAF Study") clarified many questions that NIST has refused to

address. *Id.* These comprehensive studies by Professor Hulsey and his UAF team arrived at different conclusions from the NIST studies regarding the collapse initiation and the global collapse, including that the stiffeners would indeed prevent flange bending and lateral walk-off failure of girder A2001 at column 79. *Id.* Engineer Brookman's trust in the research and publishing institutions involved (NIST and ASCE) has significantly eroded as a result of what he considers unethical conduct surrounding obvious errors and omissions in the NIST reports in question. *Id.*

## 2.    Defendants' Actions Caused Plaintiffs' Injury

Defendants err in asserting, see Def. Mem. at 27-30, that Plaintiffs fail to satisfy the causation and redressability requirements for informational standing.  An agency's action or inaction including via withholding information vital to a non-profit organization's mission can provide a basis for organizational standing, including informational standing.

> In *PETA*, an animal-welfare organization challenged the USDA's failure to apply statutory general animal welfare requirements to birds. 797 F.3d at 1089–91. Ordinarily, when the USDA applied the animal welfare requirements, an outside organization like PETA could seek redress for mistreatment by filing a complaint with the USDA. Because the USDA refused to apply those requirements to birds, PETA could not seek redress for mistreatment of birds through the USDA's complaint procedures. *Id.* at 1091. Additionally, because the USDA was not applying the requirements to birds, the USDA was not generating inspection reports that the organization used to educate its members. *Id.* **The agency inaction injured the organization because the organization suffered a "denial of access to bird-related ... information including, in particular, investigatory information, and a means by which to seek redress for bird abuse"** *Id.* at 1095. We found these injuries to be "concrete and specific to the work" in which the organization was engaged. *Id.* (quoting *Action All.,* 789 F.2d at 938). The denial of access to an avenue for redress and denial of information "perceptibly impaired [the organization's] ability to both bring [statutory] violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public." *Id.* (internal quotation marks omitted).

18

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920–21 (D.C. Cir. 2015).

The work of the PETA organization described above in the DC Circuit's decision in *Food & Water Watch, Inc. v. Vilsack* (discussing the prior D.C. Circuit decision in *People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture*, 797 F.3d 1087 (2015)) is analogous to Plaintiff AE's work to bring to 9/11 family members the truth regarding the cause of WTC 7's collapse on 9/11. FAC ¶¶ 9-26. AE's work to bring the truth to 9/11 family members about the cause of the WTC 1 and WTC 2 collapses on 9/11 (where tragically so many of the 9/11 family members lost loved ones) is inextricably intertwined (contrary to Defendants' illogical contrary assertion) with AE's similar work regarding WTC 7.

Plaintiff and 9/11 family member Robert McILvaine stated in his declaration that obtaining an accurate explanation from NIST, via the IQA RFC in which he joined, of the cause of WTC 7's collapse will lead to a better understanding of the collapses of WTC 1 and WTC 2 on 9/11, which in turn would result in a better of understanding of the cause of his son Bobby's death at the WTC on 9/11. Exhibit 2, ¶ 7. *Also see*, FAC ¶¶ 105, 123. This would assist Mr. McILvaine and his family in getting closure regarding the death of his son and ending his longstanding ongoing quest to find answers. FAC ¶¶ 41-49; Exhibit 2, ¶¶ 6-7.

NIST's violations of the IQA and NCST Act in issuing the scientifically unfounded and misleading public WTC 7 Report based on secret computer modelling and refusing to correct the Report or disclose the modelling denied AE access to the real fact and scientific evidence in NIST's possession and denied AE access to the evidence of NIST's (at best) blatant errors regarding the cause of WTC 7's collapse (including the

errors that are now known to necessarily exist in NIST's still secret computer modelling based on the recent UAF Report).

Absent NIST's IQA and NCST Act statutory violations, AE would have been able to obtain and share with the public and with 9/11 family members the government's withheld evidence of the real cause of WTC 7's collapse and/or the evidence of NIST's fraud or incompetence in issuing the WTC 7 Report which has misled the 9/11 family members for so long as to such cause. AE was clearly harmed by NIST's statutory violations in AE's efforts to assist the 9/11 family members in not only knowing the truth but in being able to prove it in a manner that might provide additional legal relief or remedies for the 9/11 family members. That harm resulted in AE's efforts to combat NIST's violations including by incurring the extraordinary expense of contracting for an independent engineering study of WTC 7's collapse, the UAF Report, which required AE to expend more than $300,000 of its limited non-profit organizational resources.

Such circumstances support a finding that the requirements for organizational and informational standing here are met, as the District Court for D.C. has recently held.

> Regarding the first prong: to qualify as an injury to the organization's interest, the challenged activity must "perceptibly impair[ ] the organization's ability to provide services." *Food & Water Watch*, 808 F.3d at 919 (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)). Put otherwise, it must "inhibit[ ]" the organization's "daily operations" in a concrete way, *PETA II*, 797 F.3d at 1094 (citation omitted), such as by "undermin[ing] the organization's ability to perform its fundamental programmatic services." *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, No. 14-1915, 2016 WL 4435175, at *6 (D.D.C. Aug. 19, 2016). A necessary aspect of this requirement is that there be a "direct conflict between the defendant's conduct and the organization's mission." *Abigail All. v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).
>
> Once this first prong is met, the Court moves on to the second and asks whether the organization will "use[ ] its resources to counteract that

> harm." *Food & Water Watch*, 808 F.3d at 919 (quoting PETA II, 797 F.3d
> at 1094). While "self-inflicted" injuries do not count, *Abigail All.*, 469
> F.3d at 133, an injury is not a "self-inflicted ... budgetary choice[ ]"
> merely by having been made willfully or voluntarily. *Equal Rights Ctr.*,
> 633 F.3d at 1139 (quoting *Fair Emp't Council of Greater Washington, Inc.
> v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)). Rather, as
> long as the organization will expend resources "to counteract[ ] the effects
> of the defendant['s]" challenged conduct, that diversion can suffice for
> Article III purposes. *Id.* at 1140.

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1,

19 (D.D.C. 2020), appeal dismissed sub nom. *Whitman-Walker Clinic, Inc. v. United

States Dep't of Health & Hum. Servs.*, No. 20-5331, 2021 WL 5537747 (D.C. Cir. Nov.

19, 2021).

Defendants argue that NIST's IQA and NCST Act related actions, even if

violations, only have an impact on AE's advocacy on issues related to its mission and

therefore AE cannot obtain informational standing based on such impacts alone. Def.

Mem. at 25. But as explained *supra*, NIST's violations impact more than AE's advocacy,

and even if AE's activities impacted by NIST's violations overlapped with advocacy or

were advocacy, this would not preclude AE from having informational standing under the

circumstances here.

> Moreover, many of our cases finding *Havens* standing involved
> activities that could just as easily be characterized as advocacy—and,
> indeed, sometimes are. In *Equal Rights Center*, for instance, we spoke of
> an injury to the organizational plaintiff's "interest in promoting fair
> housing." 633 F.3d at 1140. And in *Abigail Alliance*, although recognizing
> a distinction "between organizations that allege that their activities have
> been impeded from those that merely allege that their mission has been
> compromised," we found that the Alliance had "met this threshold by
> alleging that it actively engages in counseling, referral, **advocacy**, and
> educational services." 469 F.3d at 133 (emphasis added) (internal
> quotation marks omitted). Indeed, API's claims closely mirror those we
> found sufficient to support standing in *Spann*. There, we concluded that a
> fair housing organization had standing to sue a condominium owner over
> discriminatory advertisements, reasoning that the organization might have

to expend additional resources on public education to "rebut any public impression the advertisements might generate that racial discrimination in housing is permissible." *Spann*, 899 F.2d at 29. Here, similarly, API claims that it must expend additional resources on public education to rebut the misimpression, allegedly caused by Feld's practices, that the use of bullhooks and chains is permissible.

*American Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d

13, 26–27 (D.C. Cir. 2011).

### 3.     The Relief Sought Will Redress Plaintiffs' Injury

Contrary to Defendants' assertions, Def. Mem. at 27-30, a court order here

directing NIST to comply with the IQA and NCST Act and to issue a corrected WTC 7

Report, particularly in regard to the evidence regarding use of explosives and incendiaries

to demolish WTC 7 on 9/11, would remedy the informational injury AE and the

individual plaintiffs have suffered from NIST's violations of the NCST Act and the IQA,

and eliminate the ongoing need for AE to make extraordinary expenditures of its limited

organizational resources in educating the public regarding the false, factually misleading,

and scientifically unfounded assertions in NIST's WTC 7 Report. Such a judicial remedy

would also eliminate the need for the on-going 20-year odyssey in pursuit of the truth

suffered by the 9/11 family member plaintiffs including Robert McILvaine (see Exhibit

2), and the similar on-going inquiries by engineer Brookman and the other individual

plaintiffs.

If the Defendants are ordered to comply with the IQA and NCST Act and issue a

corrected WTC 7 Report, the result of such a NIST public report regarding the WTC 7

9/11 collapse-related evidence addressed in the RFC and the FAC that Defendants have

heretofore failed to assess or include in their WTC 7 Report is reasonably expected to

result in a better public understanding of the events of 9/11 and possibly disclosure of

criminal conduct or government malfeasance, misfeasance or non-feasance not previously known by the public. The resulting public disclosures will provide a more complete picture of the truth of what happened on 9/11, assisting the family members of the 9/11 victims, including Robert McILvaine, in coming to closure regarding this tragedy. *See* Exhibit 2, Declaration of Robert McILvaine. This is an important personal interest, shared only by the family members of the other 9/11 victims, and is distinct from the general public interest in seeing government agencies comply with the law. Mr. McILvaine has been requesting the federal government to provide him a true and complete explanation of how and why his son Bobby died at the WTC on 9/11 for two decades now, but to date no government agency has done so.

### B.     Plaintiff Architects & Engineers Has Organizational Standing

Contrary to Defendants' assertions, Def. Mem. at 25-27, as explained *infra*, Plaintiff AE has organizational standing. It should be noted that if such standing is found for AE, but informational standing is not found in regard to the individual plaintiffs such as 9/11 family member Robert McILvaine and engineer Ronald Brookman, there would not be a basis for dismissing the individual plaintiffs for lack of standing because "[w]here at least one plaintiff has standing, jurisdiction is secure." *See Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011), citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 264 (1977). And, the reverse of course would be true.

### 1.     Plaintiff AE Has Suffered Organizational Injury

Plaintiff AE has organizational standing. Defendants assert that Plaintiff AE's organizational standing assertions are indistinguishable from AE's informational standing assertions because in NIST's view AE's only relevant organizational interests are tied to

23

information that was or was not provided by NIST in its WTC 7 Report. Def. Mem. at 18.

Although there is some overlap in AE's asserted bases for informational standing and

organizational standing, there are also differences between the two. Whether or not AE

was harmed by NIST's failure to provide information to AE or the public in response to

AE's RFC, AE would still have been harmed organizationally as a result of NIST's

issuance of a fraudulent WTC 7 Report and NIST's efforts to conceal its

misrepresentations about the cause of WTC 7's collapse on 9/11 by keeping secret its

purported computer modelling on which the purported validity of NIST's WTC 7 Report

superficially stands.

Organizational standing requires an organization, just as in the case of an

individual plaintiff, to show actual or threatened injury in fact that is fairly traceable to

the alleged illegal action of the defendant and that is likely to be redressed by a favorable

court decision. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919–20 (D.C. Cir.

2015).

> An organization must allege more than a frustration of its purpose because
> frustration of an organization's objectives "is the type of abstract concern
> that does not impart standing." *Nat'l Taxpayers Union, Inc. v. United
> States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995). "The court has distinguished
> between organizations that allege that their activities have been impeded
> from those that merely allege that their mission has been
> compromised." *Abigail All. for Better Access to Developmental Drugs v.
> Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006). Accordingly, for FWW
> to establish standing in its own right, it must have "suffered a concrete and
> demonstrable injury to [its] activities." *PETA v. USDA*, 797 F.3d 1087,
> 1093 (D.C. Cir. 2015) (internal quotation marks omitted). Making this
> determination is a two-part inquiry—"we ask, first, whether the agency's
> action or omission to act injured the [organization's] interest and, second,
> whether the organization used its resources to counteract that harm." *Id.* at
> 1094 (internal quotation marks omitted). … .
>
> … Our precedent makes clear that an organization's use of resources for
> litigation, investigation in anticipation of litigation, or advocacy is not

sufficient to give rise to an Article III injury. *Id*. at 1093–94; *Turlock Irrigation Dist*., 786 F.3d at 24. Furthermore, **an organization does not suffer an injury in fact where it "expend[s] resources to educate its members and others"** *unless* **doing so subjects the organization to "operational costs beyond those normally expended."** *Nat'l Taxpayers Union, Inc*.**, 68 F.3d at 1434;** *see also Nat'l Ass'n of Home Builders v. EPA***, 667 F.3d 6, 12 (D.C.Cir.2011) (organization's expenditures must be for " 'operational costs beyond those normally expended' to carry out its advocacy mission"** (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434)).

*Id.* (emphasis added).

An organization is harmed if the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs." *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)); *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (explaining that the initial question is whether "a defendant's conduct has made the organization's *activities* more difficult"). If so, the organization must then also show that the defendant's actions "directly conflict with the organization's mission." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

The second step is required to ensure that organizations cannot engage in activities simply to create an injury. *Id. League of Women Voters*, 838 F.3d at 8. "Irreparable harm" is a higher burden than that necessary to establish Article III standing. *Nat. Res. Def. Council, Inc. v. EPA*, 383 F. Supp. 3d 1, 11 (D.D.C. 2019) ("'**an identifiable trifle is enough for standing**'").

*Nat'l Ass'n for Advancement of Colored People v. United States Postal Serv.*, 496 F. Supp. 3d 1, 12 (D.D.C. 2020), *enforcement granted,* No. 20-CV-2295 (EGS), 2020 WL 6441317 (D.D.C. Oct. 27, 2020), and *appeal dismissed,* No. 20-5375, 2021 WL 672392 (D.C. Cir. Feb. 10, 2021).

Organizational plaintiff AE meets the above articulated standard for organizational standing because, as a result of NIST's IQA and NCST Act violations in regard to NIST's WTC 7 Report, AE was put to substantial expense (more than three hundred thousand dollars) to fund an engineering study of the collapse of WTC Building

7, a study performed for AE by Professor Leroy Hulsey of the University of Alaska (the aforementioned UAF Report). Such an extraordinary diversion of organization resources, which Defendants misrepresent as a routine mission expense, Def. mem. at 26, for a non-profit organization is clearly more than a "trifle." This study was initiated in May 2015 and the final version was released on March 25, 2020. The UAF Report is an engineering analysis of the collapse of WTC Building 7 (which was not hit by any aircraft) which concluded in short that fire did not cause the collapse and that whatever did cause the collapse involved the near simultaneous failure of nearly all of the buildings steel support columns.

This extraordinary expenditure by AE for this expensive independent engineering study was a drain on the organization's resources, not simply a "setback to the organization's abstract social interests" sufficient to establish injury for purposes of the standing analysis. *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). *And see*, *Nat'l Ass'n for Advancement of Colored People v. United States Postal Serv.*, 496 F. Supp. 3d 1, 11–12 (D.D.C. 2020), *enforcement granted,* No. 20-CV-2295 (EGS), 2020 WL 6441317 (D.D.C. Oct. 27, 2020), and *appeal dismissed,* No. 20-5375, 2021 WL 672392 (D.C. Cir. Feb. 10, 2021) ("Accordingly, Plaintiff has provided evidence demonstrating that [the] Defendants' actions "directly conflict with [its] mission" because it has needed to divert resources ...").

In *Havens Realty Corp. v. Coleman*, the Court held that an organization may establish Article III standing if it can show that the defendant's actions cause a "concrete and demonstrable injury to the organization's activities" that is "more than simply a

setback to the organization's abstract social interests." 455 U.S. 363, 379 (1982). In

making the organizational standing decision in *Havens*, the Supreme Court accepted the

allegations in the plaintiff's complaint as true, as this Court should in deciding

Defendants' Motion to Dismiss here. The Court in *Havens* held that "concrete and

demonstrable injury to the organization's activities—with the consequent drain on the

organization's resources—constitutes far more than simply a setback to the organization's

abstract social interests." *Id.*

     Plaintiff AE also has an organizational financial interest at stake. On August 30,

2019, AE filed an application for a reward with the U.S. State Department and the FBI

under the State Department's Rewards for Justice Program. FAC ¶¶ 120-122. This State

Department program offers and pays rewards to citizens who report information that

leads to the arrest or conviction of persons who committed or aided the commission of

terrorist acts or crimes. As part of its application to this State Department rewards

program, AE submitted evidence and information (previously submitted to the U.S.

Attorney for the Southern District of New York pursuant to 18 U.S.C. § 3332(a)). This

evidence thoroughly addresses the fact, described in the FAC, that WTC 7, among other

WTC buildings, was destroyed by use of explosives and incendiaries on 9/11.

     If Plaintiffs here were to prevail and NIST were required by this Court to issue a

correction to its WTC 7 Report, based on the dispositive scientific and eyewitness

accounts in the evidence presented to NIST in Plaintiffs' RFC, and the credibility that

such evidence would gain from a public report from a federal agency such as NIST,

Plaintiffs would likely be successful in their claim for this federal agency reward. *See*

*Sargeant v. Dixon*, 130 F.3d 1067, 1070 (1997). *Dixon* is a case regarding standing to

enforce the mandatory statutory duty of a United States Attorney to present evidence reported by a citizen to a special grand jury. In *Dixon*, the court referenced one scenario where a plaintiff might have standing to enforce the statute at issue there as being the scenario where the plaintiff had filed an application with the government for a bounty or reward.

> We emphasize that Mohwish lacks standing because he has failed to identify any cognizable injury, not because § 3332 is inherently unenforceable at the instance of a private litigant; for example, a person who would be entitled to a bounty if a prosecution were initiated might well have standing. *Cf. Lujan,* 504 U.S. at 573, 112 S.Ct. at 2143.).

*Id. And see, cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 (1992) ("Nor, finally, is it the unusual case in which Congress has created a concrete private interest in the outcome of a suit against a private party for the government's benefit, by providing a cash bounty for the victorious plaintiff.").

Contrary to Defendants' assertions, Def. Mem. at 27-29, it is not speculative to think that a federal agency such as the State Department or the Department of Justice, faced with dispositive scientific evidence and considerable eyewitness testimony regarding the use of explosives in the destruction of two high-rise buildings that killed more than three thousand people including hundreds of First Responders, which evidence is embraced by a federal agency such as NIST in a public report made pursuant to statute, would investigate the evidence thoroughly and return an indictment that the USA would in turn pursue to a conviction. The fact that these outcomes are not certainties do not make them speculative.

It is important to note that the burden on Plaintiffs to establish standing is less demanding at this motion to dismiss stage. "[P]laintiffs are required only to state a

plausible claim that each of the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (emphasis in original). "[W]hat may perhaps be speculative at summary judgment can be plausible on a motion to dismiss," and courts should not "recast[ ] 'plausibility' into 'probability' " by demanding predictive certainty. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208–12 (4th Cir. 2017); *see also District of Columbia v. Trump*, 291 F.Supp.3d 725, 738 (D. Md. 2018) (alleging injury-in-fact at the pleading stage is not akin to climbing "Mount Everest").

> For purposes of ruling on a motion to dismiss for want of standing,
> both the trial and reviewing courts must accept as true all material
> allegations of the complaint, and must construe the complaint in favor of
> the complaining party. *E.g., Jenkins v. McKeithen,* 395 U.S. 411, 421—
> 422, 89 S.Ct. 1843, 1848—1849, 23 L.Ed.2d 404 (1969).

*Warth v. Seldin*, 422 U.S. 490, 501–02 (1975).

The Supreme Court's decision in *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772-73 (2000) does not undercut this standing argument. The Court in *Vermont* held that the reward available to a relator in a qui tam suit did not satisfy this requirement. However, qui tam lawsuits under the federal False Claims Act are distinguishable from the Plaintiffs situation here in having applied for a State Department RFJ reward based on evidence submitted regarding terrorist crimes.

Here, Plaintiffs are not simply, or primarily, seeking to obtain either a recovery for the United States as the real party in interest in a qui tam case, or some kind of financial windfall for themselves personally, they are seeking through their application to the RFJ program to get the federal government to investigate and prosecute the yet to be acknowledged 9/11 crimes that are capable of repetition, including against Plaintiffs, while the perpetrators remain at large and while their modus operandi remain

undiscovered by the federal law enforcement (and those who manage large buildings). Thus, Plaintiffs here seek not just a financial reward but also to prevent future terrorist crimes from being committed, including against themselves. Such facts are sufficient to convey Article III standing.

###### 2.    Defendants' Violations Caused AE's Organizational Injury

Had NIST honored its mandates from Congress in the IQA and the NCST Act and reported honestly the evidence of controlled demolition at WTC 7 on 9/11, the organizational plaintiff AE would not have had to expend over three hundred thousand dollars for the special engineering study contracted for by AE with civil engineering Professor Leroy Hulsey of the University of Alaska (https://www.ae911truth.org/wtc7). *See* Exhibit 1, Declaration of AE CEO Roland Angle. Plaintiff AE engaged in this extraordinary expenditure of resources in an effort to counteract the harm to its interests caused by Defendant NIST's failures to comply with the requirements of the IQA and the NCST Act.

In Plaintiffs' view, the view that matters under this Circuit's standard set in *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017), NIST's statutory obligation to issue a public report on the likely technical cause of WTC 7's collapse cannot be considered to have been complied with just because NIST issued a sham report that ignored the abundant evidence of the use of controlled demolition at WTC 7 on 9/11 and relied on a still secret black box computer modelling to mislead the public into thinking there was some fact and science supporting NIST's conclusion. *See* FAC ¶¶ 99, 135-137, 140-141, 244-264, 274-276, 280, 283-286, 355-358. NIST's WTC 7 Report could not reasonably

be considered, as a matter of fact, science, logic, or law, to have complied with this NCST Act requirement to determine the likely technical cause of WTC 7's failure on 9/11 for all the reasons spelled out in painstaking technical detail in Plaintiffs' RFC and RFC Appeal, and for the reasons detailed in the (expensive) UAF study that AE contracted for that demonstrated that NIST's WTC 7 Report's conclusions as to the likely technical cause of WTC 7's collapse could not have been correct (and neither could have NIST's secret computer modelling).

### 3.      The Relief Sought Will Redress AE's Injury

On the basis of the facts articulated in the FAC and in the attached Plaintiffs' declarations (Exhibits 1-3), and particularly in the Declaration of AE's CEO Roland Angle, and for the reasons stated *supra*, Plaintiffs can meet the standing requirements of injury traceable to Defendants' challenged actions (or failures to act) which injury would be redressed by a favorable decision on Plaintiffs' FAC requiring Defendant NIST to comply with the mandate from Congress in the NCST Act that NIST publicly report the likely technical cause of the collapse of WTC 7 on 9/11 and in doing so comply with the IQA, OMB, and NIST information quality standards. For these reasons, Plaintiffs do demonstrate organizational standing.

Contrary to the assertions of Defendants, Def. Mem. at 25-27, for the foregoing reasons organizational plaintiff AE does have organizational standing under the legal standards established in the controlling authorities and in decisions in this District. *See, e.g., Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017); *See Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.,* 659 F.3d 13 (D.C. Cir. 2011); *Havens Realty*

*Corp. v. Coleman*, 455 U.S. 363 (1982); *Sierra Club v. Morton*, 405 U.S. 727 (1972);

*Equal Rights Ctr. v. Post Properties, Inc.,* 633 F.3d 1136 (D.C. Cir. 2011); *League of*

*Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016).

AE has engaged in extraordinary efforts over 12 years since the NIST WTC 7

Report, and extraordinary expenditures of more than $300,000, to combat the

misinformation provided to the public and Congress in the WTC 7 Report. Exhibit 1,

Declaration of Roland Angle. If this Court were to issue the order requested in the FAC,

and NIST were to publicly correct its WTC 7 Report, then the on-going harm to AE

would be remedied, and the past harm would be substantially mitigated. *Id*.

    **C.**    **Plaintiffs State Claims Upon Which Relief Can Be Granted**

        **1.**    **Plaintiffs' IQA Claims Are Subject to Judicial Review**

Defendants argue in support of their Motion to Dismiss, see Def. Mem. at 30-35,

that Plaintiffs' IQA claims (Counts I-VIII) are not subject to judicial review and assert

that no court has held to the contrary. However, Defendants' argument relies on decisions

from outside the D.C. Circuit and ignores the one case from the D.C. Circuit that

provides authority contrary to their position. *See Prime Time Int'l Co. v. Vilsack*, 599

F.3d 678 (D.C. Cir. 2010).  Because of the importance of this decision in light of

Defendants' argument, the portions of the decision relevant to the IQA claim that was in

fact decided there are fully quoted here:

> Prime Time International Company, a manufacturer of small
> cigars, challenged its assessments for three quarters of FY 2005, asserting
> claims under FETRA, the Information Quality Act, 44 U.S.C. § 3516 note,
> and the Due Process Clause of the Constitution.

>       *    *    *

The district court granted summary judgment for the Secretary and USDA.

*Single Stick, Inc. v. Johanns,* 601 F.Supp.2d 307 (D.D.C.2009). **The district court** deferred to USDA's interpretation of FETRA ... *Single Stick,* 601 F.Supp.2d at 314. It rejected Prime Time's due process claim ... *Id.* at 315. **Finally, it dismissed Prime Time's claim that USDA's failure to respond to requests for disclosure and "correction" of the data underlying the assessments violated the Information Quality Act ("IQA"), 44 U.S.C. § 3516 note, ruling that the IQA did not vest any party with the right to disclosure and correction and that USDA's failure to respond did not constitute final agency action subject to judicial review under the Administrative Procedure Act,** 5 U.S.C. § 704. *Single Stick,* 601 F.Supp.2d at 316–17. Prime Time appeals, and this court's review is *de novo,* "as if the agency's decision had been appealed to this court directly."

### III.

The Information Quality Act of 2000 provides that the Director of the Office of Management and Budget ("OMB") shall, "with public and Federal agency involvement," issue guidelines by the end of September 2001 that:

> provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the purposes and provisions of chapter 35 of title 44, United States Code, commonly referred to as the Paperwork Reduction Act.

44 U.S.C. § 3516 note (a). The guidelines "apply to the sharing by Federal agencies of, and access to, information disseminated by Federal agencies," and require such agencies to "issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information ... disseminated by the agency." *Id.* § 3516 note (b)(1), (2)(A). Each such Federal agency shall, under the guidelines, "establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under" the IQA. *Id.* § 3516 note (b)(2)(B). [footnote omitted]

The OMB Guidelines define "dissemination" as "agency initiated or sponsored distribution of information to the public."[5] 67 Fed.Reg. at 8460. The definition excludes "distribution limited to ... adjudicative processes." *Id.* On appeal, USDA points to the preamble to OMB's Guidelines:

> *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies;* Republication, 67 Fed.Reg. 8452 (Feb. 22, 2002) ("OMB Guidelines").

33

The exemption from the definition of "dissemination" for "adjudicative processes" is intended to exclude, from the scope of these guidelines, the findings and determinations that an agency makes in the course of adjudications involving specific parties. There are well-established procedural safeguards and rights to address the quality of adjudicatory decisions and to provide persons with an opportunity to contest decisions. These guidelines do not impose any additional requirements on agencies during adjudicative proceedings and do not provide parties to such adjudicative proceedings any additional rights of challenge or appeal.

67 Fed.Reg. at 8454. USDA's guidelines, in turn, exclude "documents prepared and released in the context of adjudicative processes." USDA Information Quality Guidelines, Definitions, § 2, *supra* note 4.

**Prime Time sought disclosure and correction under the IQA of the data that USDA used to calculate its FETRA assessments, USDA never responded, and Prime Time challenges that nonresponse**. [footnote omitted] **USDA maintains that the IQA does not mandate the issuance of information but merely instructs OMB to "provide policy and procedural guidance" for ensuring quality, utility, and integrity of information**. 44 U.S.C. § 3516 note (a). **Prime Time relies, however, on the provision that requires agencies to "establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency."** *Id.* § (b)(2)(B). **Regardless, because Congress delegated to OMB authority to develop binding guidelines implementing the IQA, we defer to OMB's reasonable construction of the statute**. *See United States v. Mead,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). **The IQA is silent on the meaning of "dissemination," and in defining the term OMB exercised its discretion to exclude documents prepared and distributed in the context of adjudicative proceedings. This is a permissible interpretation of the statute,** *see Chevron,* 467 U.S. at 843, 104 S.Ct. 2778, and Prime Time does not contend otherwise. Rather, **Prime Time attempts to avoid the consequences of the IQA exemption for adjudications on the ground it is waived** because USDA did not raise it in the district court.

**This court has repeatedly recognized that issues and legal theories not asserted in the district court "ordinarily will not be heard on appeal."** *See, e.g., Horowitz v. Peace Corps,* 428 F.3d 271, 282(D.C.Cir.2005); *Hall v. Ford,* 856 F.2d 255, 267 (D.C.Cir.1988); *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084 (D.C.Cir.1984).

\*        \*        \*

34

**USDA did not raise the "exemption for adjudications" argument in the district court, so normally it would be forfeited**. *See generally United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). However, in *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Supreme Court observed: The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule. **Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt**, *see Turner v. City of Memphis,* 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962).

**The "proper resolution [of the IQA issue] is beyond any doubt," so this court is free to reach it.** The issue involves a straightforward legal question, and both parties have fully addressed the issue on appeal. **Consequently, no "injustice" will be done if we decide the issue**. *Id.* USDA's determination of Prime Time's assessments for three quarters of FY 2005 was an adjudication, attendant to which Prime Time had rights to an administrative appeal and judicial review. *See* 5 U.S.C. § 551(7) (defining "adjudication"); 7 U.S.C. § 518d(i), (j). **Prime Time's contention that USDA violated the IQA when it did not respond to a request to disclose and correct certain information underlying the tobacco assessments thus fails.**

Accordingly, we reverse the grant of summary judgment to USDA on Prime Time's FETRA claims, we do not reach its due process claims in view of USDA's representation about requested data that will become available to Prime Time upon remand, **and we affirm the dismissal of the IQA challenge, although on a different ground than relied upon by the district court.**

*Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 679-686 (D.C. Cir. 2010) (emphasis added). This Court can judge for itself, but in Plaintiffs' view there is only one reasonable way to read this D.C. Circuit decision, and that is that the D.C. Circuit rejected the District Court's conclusion that IQA claims were not subject to judicial review and accepted for judicial review the IQA claim at issue there and decided it on its merits.

For this reason, Defendants' assertions that IQA violation claims are not subject to judicial review, Def. Mem. at 30-37, are at best contrary to the law of this Circuit.

Although Defendants in their Memorandum in Support of Motion to Dismiss cite to the District Court decision that led to this *Prime Time* D.C. Circuit decision, which was the District Court's decision in *Single Stick, Inc. v. Johanns*, 601 F. Supp. 2d 307 (D.D.C. 2009), Defendants do not discuss the D.C. Circuit decision in *Prime Time* itself, simply referring to it in the Defendants' cite to the District Court's *Single Stick* decision stating "aff'd in relevant part on other grounds, *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010)."

Defendants also argue that the IQA is so amorphous that it provides no standards for a court engaging in judicial review to apply, and therefore agency IQA decisions are matters committed to agency discretion by law. Def. Mem. at 30-34. However, the specific information quality standards adopted by OMB, and by the various agencies including NIST, pursuant to the IQA belie this agency assertion. *See* FAC ¶¶ 74-88. Those standards such as objectivity, integrity, and utility are described in the FAC and *supra* and are clearer and more specific than many other standards applied by the federal courts in review of agency actions. *Id.*

## 2.    Plaintiffs' NCST Act Claim Is Reviewable and Timely

Defendants assert that Plaintiffs' Count IX claim asserting that NIST violated the NCST Act is untimely, having been filed more than 6 years after the issuance of NIST's WTC 7 Report at issue in that claim. Def. Mem. at 38-40. Plaintiffs acknowledge the normally applicable 6-year SOL in 28 U.S.C. § 2401, but assert that the running of that SOL is tolled by Defendants' fraudulent concealment of the facts and evidence material to that claim. *See, e.g.*, FAC ¶ 359. Defendants misunderstand or misconstrue Plaintiffs' fraudulent concealment claim.

Defendants assert that in order to establish fraudulent concealment, "the plaintiff must typically show an affirmative act of concealment-in other words, some misleading, deceptive or otherwise contrived action' to conceal information material to [his] claim." *Williams v. Conner*, 522 F. Supp. 2d 92, 100 (D.D.C. 2007), further noting that unless there is "an affirmative duty ... to disclose relevant information," a "defendant's silence is usually not enough." Citing *Williams*. Def. Mem. at 39. Plaintiffs would agree with this statement as far as it goes, but Defendants apparently misconstrue Plaintiffs' asserted basis for fraudulent concealment by NIST as being simply NIST's failures noted in the RFC to issue a scientifically and factually accurate WTC 7 Report. But there is a significant difference between issuing a report that has errors of science, fact, and logic reflecting violations of information quality standards, which are the bases for the RFC and the IQA claims, versus committing an intentional fraud.

Plaintiffs' asserted basis for the fraudulent concealment that would justify tolling the 6-year SOL on the Plaintiffs' NCST Act claim goes beyond information qualify violations of the IQA. The basis for application of the doctrine of fraudulent concealment here is that NIST knowingly and affirmatively misrepresented the cause of the WTC 7 collapse on 9/11 to be office building fires and that it had conducted valid computer modelling that supported this conclusion when in fact NIST knew that its computer modelling could not justify this conclusion and intentionally concealed its computer modelling from the public since 2008 in order to prevent discovery of this fraud by independent scientists and researchers who would attempt to verify and replicate NIST's WTC 7 collapse from fire conclusion once they had access to NIST's computer modelling.

> Equity will not lend itself to such fraud and historically has relieved from it. It bars a defendant from setting up such a fraudulent defense, as it interposes against other forms of fraud. And so this Court long ago adopted as its own the old chancery rule that where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.' Bailey v. Glover, 21 Wall. 342, 348, 22 L.Ed. 636; and see Exploration Co. v. United States, 247 U.S. 435, 38 S.Ct. 571, 62 L.Ed. 1200; Sherwood v. Sutton, Fed.Cas.No.12,782, 5 Mason 143.

> This equitable doctrine is read into every federal statute of limitation.

*Holmberg v. Armbrecht*, 327 U.S. 392, 396–97 (1946).

Although Plaintiffs remain handicapped by the fact that most of the specific material facts regarding NIST's fraud remain under the control of the wrongdoers, Plaintiffs developed a reasonable fact and evidentiary basis for asserting this fraud when the final University of Alaska Study by Dr. Hulsey was released in March 2020. *See, e.g.*, FAC ¶¶ 138, 139, 265-268, 282. In Dr. Hulsey's study, as reflected in the UAF Report, he and his team attempted to replicate NIST's findings the hard way, without access to NIST's computer modelling code or inputs, and found by trying various scenarios that the WTC 7 collapse as observed and recorded on video on 9/11 could not be replicated by any computer modelling that did not involve the near simultaneous removal of all WTC 7 columns, a feat that office building fires could never accomplish but controlled demolition routinely does. For these reasons, Plaintiffs' Count IX claim for violation of the NCST Act should be considered timely under the fraudulent concealment equitable tolling doctrine.

Defendants also assert that Plaintiffs' NCST Act claim does not state a claim subject to judicial review. Def. Mem. at 35-38. Defendants argue in this regard that

because the NCST Act requires nothing more than issuance of a report, that no matter

how bad or incomplete the report may be, Defendants did issue a report on WTC 7's

collapse so there is no violation of the NCST Act that could be claimed, and also argue

that the WTC 7 Report had no legal consequences but was merely advisory, so no judicial

review is available. *Id*. To be accepted, these arguments would require the adoption of a

rule of law that sham and fraudulent compliance by an agency or official with a statutory

mandate for a report to the public, Congress, or another agency satisfies the statute and is

not subject to any legal remedy. It is disturbing that Defendants, federal agency officials,

represented by Department of Justice attorneys, would ask a court to adopt this rule. The

Court should reject these Defendants' arguments first because fraud and sham

compliance should never be deemed actual compliance, as a matter of law and public

policy.

These arguments should also be rejected because federal law recognizes that even

in circumstances where Congress has otherwise provided that jurisdiction will be lacking,

the courts retain jurisdiction to review and strike down blatantly lawless agency action.

*See, e.g. Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986);

*Leedom v. Kyne*, 358 U.S. 184 (1958).

> "Even where Congress is understood generally to have precluded review,
> the Supreme Court has found an implicit but narrow exception, closely
> paralleling the historic origins of judicial review for agency actions in
> excess of jurisdiction." *Griffith v. FLRA,* 842 F.2d 487, 492 (D.C. Cir.
> 1988) (citing the leading case, *Leedom v. Kyne,* 358 U.S. 184, 188, 79
> S.Ct. 180, 183-84, 3 L. Ed. 2d 210 (1958) (finding judicial review proper
> despite statutory preclusion of judicial review, where the NLRB acted "in
> excess of its delegated powers and contrary to a specific prohibition" in
> the NLRA)). *Aid Ass'n for Lutherans v. U.S. Postal Service*, 321 F.3d
> 1166, 1172-73 (D.C. Cir. 2003). Plaintiff's claim here is that the USPS
> failed to comply with the requirement Congress set forth in Section 3661.

Accordingly, Plaintiff's claim "clearly admit[s] of judicial review." *Id.* at
1173.

*Nat'l Ass'n for Advancement of Colored People v. United States Postal Serv.,* 496 F.

Supp. 3d 1, 16 (D.D.C. 2020), *enforcement granted,* No. 20-CV-2295 (EGS), 2020 WL

6441317 (D.D.C. Oct. 27, 2020), and *appeal dismissed,* No. 20-5375, 2021 WL 672392

(D.C. Cir. Feb. 10, 2021).

Defendants also assert that Plaintiffs fail to state a claim in Count IX under the

NCST Act because Plaintiffs, by seeking to enforce the NCST Act (via the APA), are

circumventing the IQA which is the administrative system Congress intended to address

such claims. Def. Mem. at 40-42. But Defendants cannot have it both ways. Elsewhere in

their Memorandum, as noted *supra*, Defendants assert that the IQA has no legal teeth,

imposes not duties on the agency to do anything including not duty to provide

information or to correct information. If that view of the IQA that Defendants assert is to

be taken as correct, then the IQA can hardly be Congress' intended statutory remedy for

intentional fraud by an agency or official.

For all of these reasons, this Court should adopt the reasonable and hopefully non-

controversial position that a claim may be stated under the APA that an agency has acted

arbitrarily and capriciously and not in accordance with law if it engages in fraud in

issuing a sham report in purported compliance with a requirement of a federal statute.

### 3.    Plaintiffs State an APA Procedural Claim

Before addressing Defendants' assertion that Plaintiffs have not stated an APA

procedural claim regarding Defendants' handling of Plaintiffs' IQA RFC and

administrative appeal, see Def. Mem. at 42-44, it should be noted regarding the standing

issues addressed *supra* that when a plaintiff seeks to vindicate a procedural harm, rather than a substantive right, the causation and redressability requirements are relaxed.

> A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the Article III standing inquiry, causation and redressibility. Plaintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, could protect their concrete interests.

*Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008).

In regard to Plaintiffs' claim that Defendant NIST violated its IQA procedure of addressing a RFC's alleged informational quality violations point by point, Defendants assert that that requirement does not apply to the agency appeal decision. Even if that were true, it does apply to the agency denial of the RFC and that is sufficient to state a procedural violation claim under the APA.

Defendants again cite to the District Court's decision in *Single Stick* as a basis for arguing there can be no judicial review of IQA claims, including IQA procedural violation claims, Def. Mem. at 42, but as discussed *supra*, the D.C. Circuit's decision on appellate review of *Single Stick* in fact provided judicial review of the IQA claim there and decided it on its merits.

Defendants, again, argue that the IQA imposes no legal obligations and creates no legal rights for individuals and therefore an agency may "relax" its procedural requirements. But Defendants cite no authority to the effect that such procedural relaxation may rise to the level of bias or conflict of interest. But this is what would result if the facts alleged in the FAC, FAC ¶ 366, were proven that there was involvement of one or more officials from the Department of Commerce (DOC) in the decision to deny

the RFC and the DOC official(s) involved with the RFC decision were also in a position

of being a superior to the NIST officials deciding the RFC appeal.

Defendants assert that Plaintiffs alleged no prejudice from the procedural

violation, but this is reading the FAC too narrowly which clearly alleges that the result of

the process used by NIST to decide Plaintiffs' RFC and appeal was a complete denial of

the relief sought by Plaintiffs.

**CONCLUSION AND RELIEF REQUESTED**

For all of the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs FAC

should be denied.

Respectfully submitted,

/s/John M. Clifford
John M. Clifford, D.C. Bar No. 191866
Clifford & Garde, LLP
815 Black Lives Matter Plaza, NW,
Washington, D.C. 20006
Tel. 202.280.6115
jclifford@cliffordgarde.com

/s/ Mick G. Harrison
Mick G. Harrison, Attorney at Law (Pro Hac Vice)
Pennsylvania Bar No. 65002
520 S. Walnut Street, #1147
Bloomington, IN  47402
Phone: 812-361-6220
Fax: 812-233-3135
E-mail: mickharrisonesq@gmail.com

Attorneys of Record for all Plaintiffs.

Dated: April 11, 2022