**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ARCHITECTS & ENGINEERS FOR 9/11 TRUTH et al.,<br><br>                        Plaintiffs,<br><br>     v.<br><br>GINA RAIMONDO, in her official capacity as Secretary of Commerce, et al.,<br><br>                     Defendants. | No. 1:21-cv-2365 TNM |

## <u>DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................... iii

INTRODUCTION ....................................................................1

ARGUMENT .......................................................................2

     I.      PLAINTIFFS LACK STANDING ...........................................2

            A.     Plaintiffs Concede the IQA Provides No Basis for an Informational Injury, and They Cannot Rely on the NCST Act for Their IQA Claims ....................................................................2

            B.     The NCST Act Also Provides No Basis for an Informational Injury ...........................................................................4

            C.     Plaintiff AE Fails To Establish Organizational Standing ..............8

            D.     Plaintiffs Fail To Establish Causation or Redressability .............14

     II.     PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED...................................................................17

            A.     Plaintiffs Fail To Rebut Defendants' Argument that Their IQA Claims Are Unreviewable.................................................17

            B.     Plaintiffs' NCST Act Claim Is Time-Barred and Unreviewable ...19

            C.     Plaintiffs' Procedural Claim Fails To Identify a Plausible Procedural Violation Cognizable Under the APA ........................22

CONCLUSION .....................................................................23

## **TABLE OF AUTHORITIES**

**Cases**

*ASPCA v. Feld Ent., Inc.*, 659 F.3d 13 (D.C. Cir. 2011) ...............................................6, 10

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986) ..................................20

*Campaign Legal Ctr. v. FEC*,
        No. 21-5081, 2022 WL 1144694 (D.C. Cir. Apr. 19, 2022) .....................7, 15, 17

*Cole v. Copan* ("*Cole II*"),
        No. 19-1182, 2020 WL 7042814 (D.D.C. Nov. 30, 2020) ..................................20

*Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213 (D.D.C. 2020) .............10, 11

*Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152 (D.C. Cir. 2005) ........................10

*Doe #1 v. AFGE*, 554 F. Supp. 3d 75 (D.D.C. 2021) ......................................3, 18, 19, 23

*EPIC v. Presidential Advisory Comm'n on Election Integrity*,
        878 F.3d 371 (D.C. Cir. 2017), *cert. denied*, 139 S. Ct. 791 (2019) ....2, 3, 4, 9, 13

*EPIC v. U.S. Dep't of Commerce*, 928 F.3d 95 (D.C. Cir. 2019) ....................................13

*Family Farm All. v. Salazar*, 749 F. Supp. 2d 1083 (E.D. Cal. 2010) ......................2, 18

*FEC v. Akins*, 524 U.S. 11 (1998) .................................................................2, 3, 6, 7, 15

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015) ...........................10

*Haas v. Gutierrez*, No. 07 CV 3623, 2008 WL 2566634 (S.D.N.Y. June 26, 2008) .........2

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ..................................8, 9, 10, 11

*Heard v. U.S. Dep't of State*,
        No. 08-2123, 2010 WL 3700184 (D.D.C. Sept. 17, 2010) ..................................14

*In re Grand Jury Application*, 617 F. Supp. 199 (S.D.N.Y. 1985) ....................................7

*Lawyers' Comm. for 9/11 Inquiry, Inc. v. Barr*,
        No. 19-cv-8312, 2021 WL 1143618 (S.D.N.Y. Mar. 24, 2021) ...........................7

*Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26 (D.D.C. 2020),
        *aff'd*, 848 F. App'x 428 (D.C. Cir. 2021), *cert. denied*, No. 21-93,
        2021 WL 4508610 (U.S. Oct. 4, 2021) .......................................5, 8, 9, 10, 13, 14

*Leedom v. Kyne*, 358 U.S. 184 (1958) ........................................................20, 21

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) ...............................................7

*Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300 (D.C. Cir. 2014) .............................21

*Morris v. Sullivan*, 897 F.2d 553, 560 (D.C. Cir. 1990) ...................................21

*\*Muslim Advocates v. U.S. Dep't of Justice*,
    No. 18-2137, 2019 WL 3254230 (N.D. Cal. July 19, 2019) .........................17, 18

*NAACP v. U.S. Postal Serv.*, 496 F. Supp. 3d 1 (D.D.C. 2020) ..........................11, 12, 21

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
    496 F. Supp. 3d 31 (D.D.C. 2020), *appeal dismissed*, No. 20-5369,
    2021 WL 161666 (D.C. Cir. Jan. 12, 2021) .......................................10

*PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087 (D.C. Cir. 2015) .................................13, 15

*Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010) ...............................18, 23

*\*Pub. Citizen v. Dep't of Justice,* 491 U.S. 440 (1989) ...................................6

*Quick v. U.S. Dep't of Commerce*, 775 F. Supp. 2d 174 (D.D.C. 2011) .........................20

*\*Salt Inst. v. Leavitt*, 440 F.3d 156 (4th Cir. 2006) .........................................2

*Sanchez-Mercedes v. Bureau of Prisons*, 453 F. Supp. 3d 404 (D.D.C. 2020),
    *aff'd*, No. 20-5103, 2021 WL 2525679 (D.C. Cir. June 2, 2021) .......................21

*\*Single Stick, Inc. v. Johanns*, 601 F. Supp. 2d 307 (D.D.C. 2009), *aff'd in relevant
    part on other grounds, Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678
    (D.C. Cir. 2010) ..............................................................2

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ..........................................23

*Texas Low Income Hous. Info. Serv. v. Carson*, 427 F. Supp. 3d 43 (D.D.C. 2019) .......12

*Turlock Irrigation Dist. v. FERC*, 786 F.3d 18 (D.C. Cir. 2015) ..................................10

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    485 F. Supp. 3d 1 (D.D.C. 2020) ...............................................11

*Williams v. Conner*, 522 F. Supp. 2d 92 (D.D.C. 2007) ........................................19

**Statutes**

Information Quality Act ("IQA"), Pub. L.  No. 106-554, § 515,
    114 Stat. 2763 (2000) (codified at 44 U.S.C. § 3516 note) ......................... *passim*

National Construction Safety Team ("NCST") Act, Pub. L. No. 107-231,
    116 Stat. 1471 (2002) (codified at 15 U.S.C. §§ 7301-7313 and
    amending 15 U.S.C. § 281a) .......................................................................... *passim*

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 .....................................................8

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ............................... *passim*

5 U.S.C. § 706 ............................................................................................................19

15 U.S.C. § 281a ......................................................................................................4, 7

15 U.S.C. §§ 7301-7306 ...............................................................................................7

15 U.S.C. § 7301 ...........................................................................................................6

15 U.S.C. § 7306 .....................................................................................................8, 19

15 U.S.C. § 7307 .........................................................................................3, 4, 6, 8, 19, 21

15 U.S.C. § 7311 .................................................................................................4, 6, 21

22 U.S.C. § 2708 ........................................................................................................14

28 U.S.C. § 2401 ........................................................................................................19

**Regulations**

OMB, Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility,
    and Integrity of Information Disseminated by Federal Agencies;
    Republication, 67 Fed. Reg. 8452 (Feb. 22, 2002) ....................................... *passim*

## **INTRODUCTION**

Plaintiffs fail to rebut any of the multiple grounds for dismissal set forth in Defendants' motion to dismiss. Plaintiffs concede, as courts have uniformly agreed, that the Information Quality Act ("IQA") confers no right to information or its correctness. With this concession, Plaintiffs cannot show standing to challenge the response of the National Institute of Standards and Technology ("NIST") to their IQA correction request. While Plaintiffs attempt to rely on the National Construction Safety Team ("NCST") Act as a basis for informational and organizational injury, the NCST Act imposes no obligations with respect to IQA correction requests, nor does it require any disclosure beyond NIST's original report, issued over a decade ago, regarding the September 11, 2001 collapse of World Trade Center ("WTC") building 7. Plaintiffs also cite money spent by organizational plaintiff Architects & Engineers for 9/11 Truth ("AE") on commissioning its own alternative report, but that expenditure fails to bolster AE's standing when it falls squarely within AE's core mission of contesting NIST's conclusions.

Plaintiffs' further concession that neither NIST's IQA correction responses nor its original WTC 7 Reports qualify as final agency action—a prerequisite for their Administrative Procedure Act ("APA") claims—provides an alternative basis for dismissal. Moreover, Plaintiffs' speculative theory of fraudulent concealment cannot toll the applicable six-year statute of limitations, which bars their NCST Act claim at the outset. The lack of a cognizable concrete interest or a final agency action also dooms Plaintiffs' procedural claim, which can also be rejected based on the plain insufficiency of Plaintiffs' bare allegations in the face of NIST's actual responses to their IQA request and appeal. The Court therefore should dismiss Plaintiffs' claims in their entirety.

## ARGUMENT

**I.      PLAINTIFFS LACK STANDING**

### A.      Plaintiffs Concede the IQA Provides No Basis for an Informational Injury, and They Cannot Rely on the NCST Act for Their IQA Claims

As discussed in Defendants' opening brief, Plaintiffs cannot identify an informational injury for their IQA claims (Counts I-VIII and X), and thus cannot establish standing on that basis, because the IQA does not require public disclosure of information that Plaintiffs have failed to obtain, nor did Congress intend the IQA to prevent harms of the type Plaintiffs assert. *See* Def. Mem. at 18-22 (citing relevant informational injury test in *FEC v. Akins*, 524 U.S. 11, 21 (1998); *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017)). Rather, under the IQA and the related guidelines promulgated by the Office of Management and Budget ("OMB"), agencies must provide an administrative mechanism to seek correction of information that an agency has *already* disseminated, but agencies retain discretion over how to respond to correction requests, and neither the IQA nor the OMB guidelines require that incorrect information be re-disseminated in a corrected form. IQA, Pub. L. No. 106-554, § 515(b)(2)(B), 114 Stat. 2763 (2000) (codified at 44 U.S.C. § 3516 note); OMB guidelines, 67 Fed. Reg. 8452, 8459 (Feb. 22, 2002) (requiring agencies to establish "administrative mechanisms" that allow correction requests to be submitted, but giving agencies substantial flexibility regarding their responses). Indeed, all courts to have addressed the issue have held that the IQA confers no right to information or its correctness. *Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006); *Single Stick, Inc. v. Johanns*, 601 F. Supp. 2d 307, 316 (D.D.C. 2009), *aff'd in relevant part on other grounds sub nom. Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010); *Family Farm All. v. Salazar*, 749 F. Supp. 2d 1083, 1103 (E.D. Cal. 2010); *Haas v. Gutierrez*, No. 07 CV 3623, 2008 WL 2566634, at *6 (S.D.N.Y. June 26, 2008).

Plaintiffs concede that the informational injury test of *Akins* and *EPIC* applies to their assertions of standing. Pl. Opp. at 11-13. They also concede—by failing to argue otherwise—that the IQA contains no disclosure requirement, thus dooming any notion that Plaintiffs have an informational injury pursuant to the IQA. *See id.* at 16 (acknowledging Defendants' argument that the IQA imposes no disclosure requirement but failing to oppose that argument or identify any language in the IQA that, even under Plaintiffs' interpretation, requires disclosure of information); *cf. Doe #1 v. AFGE*, 554 F. Supp. 3d 75, 119 (D.D.C. 2021) (collecting cases recognizing that courts may treat a plaintiff's failure to oppose arguments raised in a motion to dismiss as a concession). Instead, Plaintiffs rely solely on the NCST Act as the basis of their standing to assert their IQA claims. *See* Pl. Opp. at 16 (arguing that the NCST Act "supplies the basis for Plaintiffs' standing to challenge NIST's IQA related actions"). But Plaintiffs cite no authority for the notion that an asserted informational injury for purposes of their IQA claims could derive from any statute other than the IQA itself. Nor is such a notion tenable under *Akins*.

Under *Akins*, an informational injury must derive from a statutory disclosure requirement, and the statute must "seek to protect [plaintiffs] from the kind of harm they say they have suffered." *Akins*, 524 U.S. at 21-22. But the NCST Act imposes no disclosure obligation on NIST's responses to Plaintiffs' IQA correction request and appeal—which are what Plaintiffs challenge in their IQA claims. To the contrary, the NCST Act simply requires a report following an investigation of a building collapse. 15 U.S.C. § 7307. The NCST Act is entirely silent with respect to IQA correction requests or NIST's responses to such requests, nor does the IQA reference or otherwise incorporate the NCST Act. There is no support in the NCST Act, nor do Plaintiffs cite any authority, for the notion that Congress intended the NCST Act to protect those who submit IQA correction requests from allegedly flawed responses. Accordingly, Plaintiffs cannot support their

informational standing to assert Counts I-VIII or X by reference to the NCST Act. Their IQA claims may be dismissed on this basis alone.

### B.      The NCST Act Also Provides No Basis for an Informational Injury

Plaintiffs also cannot show an informational injury based on the NCST Act, even with respect to their NCST Act claim in Count VIII, because the NCST Act imposes no disclosure requirement beyond the reports that, Plaintiffs concede, NIST issued over a decade ago. As explained in Defendants' opening brief, the relevant NCST Act provision, 15 U.S.C. § 7307, states that the team investigating a building collapse (here, NIST itself, *see id.* § 7311) shall issue a public report within 90 days of its investigation that contains, among other things, "an analysis of the likely technical cause or causes of the building failure investigated," and NIST issued the WTC 7 Reports in November 2008. *See* Def. Mem. at 23.

Plaintiffs do not suggest that the WTC 7 Reports are devoid of any analysis. Rather, the crux of their NCST Act claim is that the analysis in the WTC 7 Reports is flawed. *See* FAC ¶¶ 354-357 (conceding that NIST issued the WTC 7 Reports but claiming the content of the Reports "fail[ed] to honor the spirit and purpose of the NCST Act"); Pl. Opp. at 16 (arguing that because the WTC 7 Reports were, in Plaintiffs' view, "at best an unscientific sham, and likely fraudulent," they failed to include "critically important information"). But as Defendants explained, the NCST Act confers no right to correctness with respect to the report required under § 7307. Def. Mem. at 23. Nor can Plaintiffs show, under the second prong of the informational injury test, that, "by being denied access" to the information they claim was required, they have suffered "the type of harm Congress sought to prevent by requiring disclosure," *EPIC*, 878 F.3d at 378. Def. Mem. at 23. For one thing, the NCST Act expressly prohibits third parties, including individuals or organizations affected by a past building collapse, from using information in such reports in their own lawsuits.

15 U.S.C. § 281a.

Plaintiffs contend that the Court is obligated to accept their asserted interpretation of the NCST Act at the motion to dismiss stage. Pl. Opp. at 12-14. However, in a decision affirmed by the D.C. Circuit, this Court already rejected that very argument in the face of plain statutory language. *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray* ("*Lawyers' Comm.*"), 424 F. Supp. 3d 26, 32-33 (D.D.C. 2020), *aff'd*, *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428, 430–31 (D.C. Cir.), *cert. denied*, 142 S. Ct. 228 (2021). In *Lawyers' Committee*, as here, Plaintiffs AE and McIlvaine, as well as another organizational plaintiff, sought to force a federal agency to change the conclusions reached regarding the 9/11 attacks in reports that had already been issued, even though no statute required such revisions. Specifically, nine years after the National 9/11 Commission issued a report in 2004, Congress appropriated funds for a review of how the FBI had implemented the report's recommendations. *Id.* at 28. The FBI then issued a new report of its review, but the plaintiffs brought suit arguing that the new report should have addressed seven different categories of evidence, which they believed would bolster their view that "'pre-placed' explosives caused the World Trade Center buildings to collapse." *See id.* at 28-29. Although the plaintiffs in that case urged the Court to accept their statutory interpretation, the Court instead recognized that "the case law does not require the Court to ignore the plain terms of a statute, even at the pleading stage." *Id.* at 32. Where the "*text* of th[e] [statutory] provision" at issue did not "require the disclosure of information," the plaintiffs could not interpret their way to standing based on legislative history alone. *See id.* at 30-31.

Plaintiffs attempt to distinguish *Lawyers' Committee* on the ground that, unlike the appropriations law at issue in that case, the NCST Act does require a report. *See* Pl. Opp. at 16-17. However, the report that the NCST Act, by its plain terms, required in connection with WTC 7

was issued over a decade ago, following the investigation that NIST conducted pursuant to the NCST Act, *see* 15 U.S.C. § 7311, which included opportunities for public input and peer review. *See, e.g.*, WTC 7 1A Rpt. at xxix-xxxiii.[1] Plaintiffs cannot manufacture an informational injury simply by baldly alleging that the WTC 7 Reports—though undeniably reports that contain analyses of what NIST identified as the likely cause of WTC 7's collapse—do not qualify as the report required by § 7307.

Nor does the text of the NCST Act confer a guarantee that the report will disclose the *actual* cause of a building collapse. The language of § 7307 requires that the report contain an "analysis" of the likely cause. *See* 15 U.S.C. § 7307(1). Nothing in § 7307, or any other NCST Act provision, supports any continuing obligation on NIST's part to revise a report once it has been issued, even if third parties independently question the report's conclusions. To the contrary, read in the context of the NCST Act as a whole, which is primarily aimed at setting up and conducting *investigations* of building collapses that will "establish the likely technical cause or causes of the building failure," *id.* § 7301(b)(2)(A), § 7307(1) simply requires that the report explain the results of the investigation. Indeed, because the report is in that sense secondary to the investigation itself, the NCST Act is unlike the disclosure provisions at issue in *Akins* and *Public Citizen v. Dep't of Justice*, 491 U.S. 440 (1989). Instead, it resembles provisions in the Endangered Species Act ("ESA"), which the court in *ASPCA v. Feld Ent., Inc.*, 659 F.3d 13 (D.C. Cir. 2011), deemed "secondary" to the statute's primary purpose, and thus insufficient to transform the ESA into a disclosure law that could give rise to an informational injury. *See id.* at 24. Although Plaintiffs cite *ASPCA* in support of their standing, they fail to address the court's conclusion that the plaintiffs in

---

[1] As noted in Defendants' opening brief, Def. Mem. at 11 n.2, NIST's reports are publicly available at https://www.nist.gov/el/finalreports-nist-world-trade-center-disaster-investigation.

that case *lacked* standing—as indicated in Defendants' opening brief. Def. Mem. at 23.[2]

Moreover, in regard to the second prong of the informational injury test, Plaintiffs fail to assert harms within the scope of what Congress intended the NCST Act to protect against. In their opposition brief, Plaintiffs no longer point to their inability to use the report for evidentiary purposes as an alleged harm for purposes of informational standing, implicitly conceding that such uses are expressly foreclosed by 15 U.S.C. § 281a. Instead, Plaintiffs focus on their efforts to challenge the WTC 7 Reports' conclusions. Plaintiffs claim that the alternative study they commissioned led Plaintiff Ronald Brookman, an engineer, to lose trust in NIST. Pl. Opp. at 17. Of course, to the extent that study provides Plaintiffs with the "information" they seek, it defeats informational standing rather than bolsters it. *See Campaign Legal Ctr. v. FEC*, No. 21-5081, 2022 WL 1144694, at *8 (D.C. Cir. Apr. 19, 2022) (recognizing plaintiff "cannot establish injury based on information that is already available from a different source and that would only result in duplicative reporting" (internal quotation omitted)). Moreover, although the NCST Act sets forth procedures that might generally bolster public confidence in the investigations that it authorizes, *see* 15 U.S.C. §§ 7301-7306, there is no indication (and Plaintiffs point to none) that Congress intended a NCST Act report to protect against negative reactions of specific individuals in the future who choose to pursue different theories.

---

[2] Plaintiffs also cite *In re Grand Jury Application*, 617 F. Supp. 199 (S.D.N.Y. 1985); *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973); and a number of other cases that do not address the informational injury analysis of *Akins* at all but instead appear to address private rights of action. *See* Pl. Opp. at 14-15. But Plaintiffs already acknowledge that the NCST Act does not provide a private right of action by bringing their claims, including their NCST Act claim in Count IX, under the APA instead of directly under the NCST Act. *See* FAC ¶ 346. Moreover, in response to a similar argument raised by plaintiffs AE and McIlvaine, among others, in *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Barr*, No. 19-cv-8312, 2021 WL 1143618 (S.D.N.Y. Mar. 24, 2021), the court pointed out that *In re Grand Jury Application* is no longer good law. *See id.* at *6 n.5.

Similarly, resources expended on critically evaluating a report's conclusions, or on conducting independent analyses, do not qualify as cognizable harms under the NCST Act, which contains no guarantee that a report issued under § 7307 will be the final word regarding the causes of a building collapse. To the contrary, as explained in Defendants' opening brief, other statutes provide the mechanisms for an individual to seek correction of information in a report once it has been issued (the IQA), or to seek disclosure of information not included in a report (the FOIA). *See* Def. Mem. at 23-25. In particular, to the extent Plaintiffs claim that they were denied disclosures of computer modelling information, Pl. Opp. at 19-20, any such disclosure obligation, to the extent it exists, would arise only in response to a request under the FOIA. *See* 15 U.S.C. § 7306 (cross-referencing FOIA). No FOIA claim is at issue here. Nor does Plaintiffs' conclusory assertion that the WTC 7 Reports were "an unscientific sham, and likely fraudulent," Pl. Opp. at 15-16, change the plain meaning of § 7307, which requires nothing beyond the report that was already issued. The Court should therefore hold that Plaintiffs fail to identify a cognizable informational injury under the plain terms of the NCST Act.

**C.     Plaintiff AE Fails To Establish Organizational Standing**

Defendants also explained in their opening brief that the organizational Plaintiff, AE, fails to satisfy the requirements of organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). As an initial matter, Defendants pointed out that AE's alleged "organizational" injuries are themselves informational in nature. Def. Mem. at 25. Indeed, in this respect, the situation here is identical to that in *Lawyers' Committee*, where AE and the other organizational plaintiff cited their application for a State Department reward as well as various expenditures—including AE's expenditure "funding their own engineering study"—in support of their organizational standing, but the Court rejected both theories. *Lawyers' Comm.*, 424 F. Supp.

3d at 34-35. The Court in that case questioned whether AE could invoke *Havens* standing at all, given the Court's conclusion that the plaintiffs in that case had no informational interest at stake. *See id.* at 33; *see also EPIC*, 878 F.3d at 379 (plaintiff "cannot ground organizational injury on a non-existent [informational] interest"). Although the Court then rejected organizational standing because AE failed to plead sufficient facts, *Lawyers' Comm.*, 424 F. Supp. 3d at 35, the Court also denied leave to amend because even AE's asserted organizational injury "hinges on [its] (unsuccessful) theory of informational injury," *id.* at 36.

Here, Plaintiffs cite AE's engineering study in the FAC, FAC ¶ 15, and argue in their opposition that the high cost of the study qualifies as "an extraordinary diversion of organization resources" that supports AE's organizational standing. Pl. Opp. at 25-26. However, the Court's prior concern that this alleged expenditure is "part and parcel of [Plaintiffs'] alleged informational injury" continues to apply because, under Plaintiffs' theory, the expenditure was intended to refute others' conclusions—whether those of the National 9/11 Commission, as AE asserted in *Lawyers' Comm.*, 424 F. Supp. 3d. at 33, or the WTC 7 Reports, as AE asserts here. Because Plaintiffs' theory of informational injury fails for the reasons discussed above, AE's theory of organizational injury also fails for the same reasons. *See id.*; *see also EPIC*, 878 F.3d at 379 ("any resources [plaintiff] used to counteract the lack of a privacy impact assessment . . . in which it has no cognizable interest . . . were a self-inflicted budgetary choice that cannot qualify as an injury in fact" (internal quotation omitted)).

Even aside from the informational nature of AE's asserted injuries, Defendants also explained that the test for *Havens* standing is not satisfied here because AE's mission is focused on pure issue advocacy rather than providing services. AE's expenditure of resources in furtherance of its advocacy efforts in challenging the WTC 7 Reports, including by commissioning

9

its own alternative study, does not qualify as a "diversion" of the type that supports *Havens* standing. Def. Mem. at 25-27; *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 220 (D.D.C. 2020) ("If an organization alleges 'only impairment of its advocacy,' that 'will not suffice' to show standing." (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)); *cf. Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury"). In *Lawyers' Comm.*, this Court also recognized that "the point of" the organizations' asserted expenditures in that case, including AE's engineering study, "seems to be 'advocacy'—shedding light on what these organizations believe were the true causes of the September 11 attacks." *Lawyers' Comm.*, 424 F. Supp. 3d at 35.

Plaintiffs cite *ASPCA* as supporting organizational standing even where an organization's mission is focused on advocacy. Pl. Opp. at 21. However, the court in *ASPCA* declined to resolve the question of "whether injury to an organization's advocacy supports *Havens* standing" because it held the plaintiff failed to satisfy the causation prong of standing. *ASPCA*, 659 F.3d at 27. After *ASPCA*, courts have continued to cite *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005), as precluding organizational standing based solely on pure issue advocacy. *See Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.,* 496 F. Supp. 3d 31, 48 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021).

Moreover, the court in *ASPCA* emphasized that an organization must show that the defendant's conduct is "clearly 'at loggerheads' with the organization's mission." *ASPCA*, 659 F.3d at 27. But here, as Defendants explained, there is no discernible "direct conflict" between NIST's issuance of the WTC 7 Reports, or its responses to Plaintiffs' IQA correction request and appeal, and AE's mission. Def. Mem. at 25-27. To the contrary, AE's very existence appears to

10

stem from disagreements with the WTC 7 Reports as well as other reports addressing the WTC building collapses. FAC ¶ 9; *cf.* Decl. of Roland Angle ("Angle Decl.") [ECF 14-1] ¶¶ 2, 10-12 (describing AE's "now-13-year effort to scrutinize the NIST WTC 7 Report," to "publicly critique its findings," to "educate the public regarding the errors in NIST's findings," and to "work[] with victims' families and other stakeholders to advocate for a new investigation"). By trying to counter NIST's WTC 7 Reports and bolster its contradictory views of the reasons for the WTC 7 collapse, AE is not impaired in pursuit of its mission but is instead pursuing that mission. FAC ¶¶ 9-10, 15; *see Ctr. for Democracy & Tech*, 507 F. Supp. 3d at 221 (plaintiff "cannot assert Article III standing by claiming the activities that it would otherwise engage in now injure it").

Plaintiffs fail to identify any *activities*, other than advocacy, that were directly impaired by the WTC 7 Reports or NIST's responses to the IQA correction request and appeal, and from which AE diverted resources in order to counteract such a harm. In their opposition brief, Plaintiffs argue that AE's mission involves more than advocacy because they also seek to help 9/11 family members "know[] the truth" and "prove it" in legal proceedings. Pl. Opp. at 20. However, that alleged work is simply advocacy by another name. AE's declarant concedes that, far from offering anything akin to family counseling or legal services, AE communicates with 9/11 families to gain their cooperation with and participation in AE's advocacy efforts. Angle Decl. ¶ 2.

AE's claims stand in stark contrast to those deemed sufficient to establish *Havens* standing, which typically involve an organization engaged in providing services of some kind—whether legal, health care, housing, or otherwise—and a claim that the defendant's conduct has interfered in some way with the organization's ability to provide those services. For example, in *NAACP v. U.S. Postal Serv.*, 496 F. Supp. 3d 1 (D.D.C. 2020), cited by Plaintiffs, the NAACP was engaged in voter registration and voter turnout efforts but claimed that mail delays had forced it to divert

resources away from those activities in order to counteract the impact of such delays by organizing transportation for the delivery of absentee ballots. *Id*. at 11-12. Similarly, in *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020), also cited by Plaintiffs, the plaintiffs provided health care services but claimed that an agency rule would interfere with their ability to provide such services by increasing demand beyond their operational capacity. *See id.* at 20-22. Plaintiffs identify no similar services provided by AE, nor do they allege facts suggesting that the WTC 7 Reports or NIST's responses to their IQA correction request and appeal have impaired their ability to provide such services.

Here, AE has not established a direct conflict even with respect to its advocacy activities. As discussed, AE's asserted activities supposedly aimed at rebutting the WTC 7 Reports or NIST's responses to the IQA correction request and appeal do not impair AE's mission but instead are part and parcel of that mission. The situation here resembles *Texas Low Income Hous. Info. Serv. v. Carson*, 427 F. Supp. 3d 43 (D.D.C. 2019), where the plaintiff organization failed to show that its research and evaluation of state housing issues were directly impeded by HUD's alleged failure to enforce federal laws against the City of Houston, but merely alleged that "it has more work to do" because of that lack of enforcement. *Id.* at 55. Indeed, the court noted that "the complaint itself incorporates research and analysis that [the plaintiff] has undertaken to support its claims in this very case." *Id.* at 56. Similarly here, the gist of AE's allegations is that it has had to work harder towards its mission of attempting to "educat[e]" the public "as to the true reasons the[] WTC buildings collapsed on 9/11" because the WTC 7 Reports do not agree with AE's theories, and that it has gone so far as to commission its own report in order to obtain its preferred results. Pl. Opp. at 14. AE heavily relies on the notion that its commissioned report cost more than it usually spends. *Id.* at 25. But at the same time, Plaintiffs cite and rely on that report when making allegations in

support of their claims, and evidently did the same in their IQA correction request and appeal. As in *Texas*, such efforts do not qualify as a direct conflict. Rather, such expenditures reflect AE's own budgetary choices regarding how best to pursue its mission. *Cf. EPIC v. U.S. Dep't of Commerce*, 928 F.3d 95, 101 (D.C. Cir. 2019) (discussing *EPIC*, 878 F.3d at 379, as squarely rejecting the notion that an organization's expenditure of resources on "obtaining information" that it sought elsewhere was sufficient to qualify as an organizational injury in fact). The situation here is different from *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015), where the plaintiff asserted that it was deprived of information that it needed to carry out its mission of investigating bird-related incidents. *See id.* at 1094-95. Here, AE chose to commission its own report, not as a means of counteracting an impairment caused by the WTC 7 Reports, but instead as an end in and of itself—a substitute report in furtherance of AE's mission.

Defendants pointed out in their opening brief that, although Plaintiffs' FAC alleged that AE had applied for a reward under the State Department's Rewards for Justice Program, this Court already recognized that the prospect of any such reward was too speculative to support organizational standing. Def. Mem. at 27-28; *cf. Lawyers' Comm.*, 424 F. Supp. 3d at 34. In their opposition, Plaintiffs continue to assert that AE has "an organizational financial interest at stake" because it has applied for such a reward, Pl. Opp. at 27, but they do not explain how, if at all, this assertion relates to their alleged *Havens* standing, nor whether they intend this assertion to support an injury-in-fact, redress, or something else. In any event, Plaintiffs fail to show that AE's supposed financial interest is anything more than speculation. Plaintiffs suggest that their claims in this action, if successful, might tip the scale in favor of AE receiving the reward, and that the State Department's program is thus equivalent to a "cash bounty" for their litigation success. *See id.* at 27-28. But Plaintiffs' conclusory assertion that AE's State Department application would

13

gain "credibility" if they prevail here, despite the fact that the program is administered by an entirely independent agency with complete discretion over its selection of awardees, fails to raise AE's asserted interest above the speculative level, as this Court has previously recognized. *Lawyers' Comm.,* 424 F. Supp. 3d at 34 ("It is wildly speculative that a court order directing the FBI to report on Plaintiffs' seven categories of evidence would allow them to claim a reward [under the Rewards for Justice program]."); *see also Heard v. U.S. Dep't of State*, No. 08-2123, 2010 WL 3700184, at *4 (D.D.C. Sept. 17, 2010) (noting that "the administration of the Rewards Program lies within the 'sole discretion' of the Secretary of State, subject only to consultation with the Attorney General" (quoting 22 U.S.C. § 2708(b)). Plaintiffs merely compound the speculative nature of their assertions when they claim that they not only seek a cash reward, but they also seek criminal prosecutions as well as "to prevent future terrorist crimes from being committed, including against themselves." Pl. Opp. at 29-30. Plaintiffs fail to identify any connection between the State Department's program and such potential outcomes.

### D.    Plaintiffs Fail To Establish Causation or Redressability

As discussed in Defendants' opening brief, Plaintiffs also fail to establish the other two prongs of standing. They fail to show that their asserted informational injuries are fairly traceable to NIST's responses to their IQA correction request and appeal (for Counts I-VIII, X), or to the WTC 7 Reports (Count IX), nor do they show that this Court could redress those injuries. Def. Mem. at 27-30. Rather, Plaintiffs merely speculate about the reactions of third parties, should NIST be required to correct or issue a new report reaching Plaintiffs' desired conclusion, ignoring that the IQA does not require NIST to respond in a particular way to IQA correction requests, nor does the NCST Act require NIST to reach a particular conclusion.

To the extent Plaintiffs' opposition brief addresses Defendants' arguments at all, Plaintiffs

14

fail to establish that these prongs of individual or organizational standing are satisfied. *See* Pl. Opp. at 18-25, 30-32. As discussed above, Plaintiffs concede that they cannot invoke the IQA to support an informational injury, but Plaintiffs ignore the necessary corollary to this concession—that they therefore also fail to satisfy the causation and redressability prongs of standing for their IQA claims. Plaintiffs' IQA claims in Counts I-VIII and X challenge NIST's responses to their IQA correction request and appeal. Thus, any informational injury must be fairly traceable to those responses, and any remedy would have to require NIST to disclose additional information in those responses. *See Akins*, 524 U.S. at 25 (concluding causation was satisfied because the asserted informational injury was "'fairly traceable' to the FEC's decision about which respondents complain"); *see also Campaign Legal Ctr*, 2022 WL 1144694, at *9 (plaintiffs' asserted deprivation of information allegedly required by Federal Election Campaign Act was fairly traceable to agency's dismissal of administrative complaint brought under same statute). Plaintiffs attempt to rely on the NCST Act rather than the IQA for their asserted informational injuries, but as discussed above, the NCST Act imposes no requirements with respect to IQA correction requests, or NIST's responses to such requests. NIST's IQA responses therefore cannot have caused an informational injury grounded in the NCST Act, nor can NIST be compelled to revise those responses based on the NCST Act. Rather, NIST's IQA responses need only conform to the IQA, which grants NIST broad discretion.

Rather than trying to connect their theories of causation and redress to the informational injuries that they allege, Plaintiffs simply assert that AE's position in this case is analogous to that of PETA in *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087 (D.C. Cir. 2015), on the ground that both involve "withholding information vital to a non-profit organization's mission," Pl. Opp. at 18-19. However, Plaintiffs fail to address Defendants' explanation that *PETA* is quite different, involving

15

a situation where PETA was denied access to an entire category of information—inspection reports about bird-related Animal Welfare Act violations—based on the defendant agency's interpretation of the AWA to exclude birds. Def. Mem. at 27. Unlike in *PETA*, Plaintiffs fail to identify any link between the statutory language of either the IQA or the NCST Act and their asserted goal of "bring[ing] the truth to 9/11 family members about the cause of the WTC 1 and WTC 2 collapses on 9/11." Pl. Opp. at 19. Instead, as discussed above, neither statute requires disclosure of information of the kind that Plaintiffs assert would redress their injuries.

Plaintiffs also assert that setting aside NIST's responses to their IQA correction request and appeal regarding the collapse of WTC 7 would "lead to a better understanding of the collapses of WTC 1 and WTC 2 on 9/11, which in turn would . . . assist [plaintiff] McIlvaine and his family in getting closure regarding the death of his son." Pl. Opp. at 19. But Plaintiffs fail to square this assertion with their prior concession that the IQA confers no right to information or its correctness, which led them to rely solely on the NCST Act for their asserted informational injury. Nor do Plaintiffs identify any factual support for the notion that their desired conclusion regarding WTC 7—that it collapsed due to planted explosives—would impact the commonly understood conclusion that WTC 1 and WTC 2 collapsed as a result of airplanes being flown into them.

Plaintiffs also insist that if NIST is directed to issue the conclusions that Plaintiffs seek, their informational injuries will be redressed because they will no longer need to pursue "the truth." Pl. Opp. at 22. But under Plaintiffs' own theory, they already know "the truth," and as far as they are concerned, the alternative report that they commissioned provides them with the conclusions that they sought. *See, e.g.*, FAC ¶¶ 15, 139. Plaintiffs do not assert any intention or need to commission additional costly reports in the future. Even if Plaintiffs' asserted desire for the "truth" could by itself qualify as a cognizable injury, Plaintiffs defeat their own argument by claiming that

they have already obtained the relief they seek through their own efforts. *Cf. Campaign Legal Ctr.*, 2022 WL 1144694, at *7. Plaintiffs' only response appears to be that further issuances by NIST could allow AE to help 9/11 family members "prove [the truth] in a manner that might provide additional legal relief or remedies," Pl. Opp. at 20, but they ignore that the NCST Act precludes such information from being used for such purposes, *see* 15 U.S.C. § 281a.

In regard to AE's asserted organizational injury, in the form of its expenditure on its own alternative report, Plaintiffs' causation analysis, *see* Pl. Opp. at 30, simply rehashes their organizational injury and informational injury analyses, which fail for the reasons explained above. Plaintiffs' assertion that AE would not have commissioned its study if not for NIST's issuances, *see id.*, is also suspect, given AE's prior public assertion that the study was needed because of an entirely separate report issued by the National 9/11 Commission. *Lawyers' Comm.*, 424 F. Supp. 3d at 35. Plaintiffs' claims therefore should be dismissed for lack of standing.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A.   Plaintiffs Fail To Rebut Defendants' Argument that Their IQA Claims Are Unreviewable

As discussed in Defendants' opening brief, Plaintiffs' IQA claims fail to satisfy at least two prerequisites for APA review. First, judicial review is barred because NIST's responses to IQA correction requests are committed to its discretion. Def. Mem. at 30-34. Under the IQA and OMB guidelines, agencies may weigh their own priorities regarding resource allocation when determining whether to consider or grant a correction request. *Muslim Advocates v. U.S. Dep't of Justice*, No. 18-2137, 2019 WL 3254230, at *8 (N.D. Cal. July 19, 2019). Moreover, neither the IQA nor agency guidelines provide judicially manageable standards that a court could apply to evaluate NIST's exercise of discretion in its response. *See id.* Second, Plaintiffs' IQA claims are

17

also unreviewable because NIST's responses to Plaintiffs' correction request and appeal do not qualify as final agency actions. Def. Mem. at 34-35.

Plaintiffs assert that the D.C. Circuit's decision in *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010), compels the conclusion that IQA claims are reviewable. Pl. Opp. at 32. Although their argument consists of little but an extended block quote and a statement that "[t]his Court can judge for itself," Pl. Opp. at 35, Plaintiffs appear to misread the court's opinion. The court in *Prime Time* did not reach the question of whether APA review of an agency's IQA correction response was barred, and instead affirmed the district court's dismissal on other grounds. *Prime Time*, 599 F.3d at 685 (holding that the plaintiff's correction request related to information distributed through "adjudicative processes," and thus was excluded from the IQA's scope under the OMB guidelines). At least two other courts have rejected the notion that *Prime Time* supports judicial review of IQA claims. *See Muslim Advocates*, 2019 WL 3254230, at *10 (explaining that the court in *Prime Time* "did not conclude that the IQA provides a right to review under the APA"); *Family Farm All. v. Salazar*, 749 F. Supp. 2d 1083, 1100 (E.D. Cal. 2010) (rejecting argument that the *Prime Time* decision "amounts to an implied finding that there is a right to judicial review under the IQA" because the D.C. Circuit had "no need to and that decision did not evaluate" that question).

Plaintiffs otherwise make little attempt to refute Defendants' arguments. They do not respond at all to Defendants' argument that Plaintiffs fail to challenge a final agency action, thus conceding the issue. *Doe #1*, 554 F. Supp. 3d at 119. Dismissal is thus warranted on that ground alone. With respect to Defendants' alternative argument that IQA responses to correction requests are committed to agency discretion, Plaintiffs simply state that the underlying "objectivity, integrity, and utility" standards "are clearer and more specific than many other [unidentified]

18

standards." *See* Pl. Opp. at 36. As Defendants have explained, however, the discretion at issue has to do with agency responses to IQA correction requests, not the agency's application of objectivity, integrity, or utility standards. Plaintiffs thus fail to meaningfully respond to Defendants' 12(b)(6) arguments with respect to their IQA claims, and Plaintiffs' IQA claims are subject to dismissal under Rule 12(b)(6) for the reasons explained in Defendants' opening brief.

**B.    Plaintiffs' NCST Act Claim Is Time-Barred and Unreviewable**

Plaintiffs' NCST Act claim should also be dismissed under Rule 12(b)(6). As Defendants explained, Plaintiffs fail to state a claim under 5 U.S.C. § 706(1) that NIST unlawfully withheld the report required by 15 U.S.C. § 7307 because NIST indisputably did issue the WTC 7 Reports. Def. Mem. at 36. In their opposition brief, Plaintiffs fail to oppose dismissal of any claim under § 706(1), thus conceding that any such claim should be dismissed. *Doe #1*, 554 F. Supp. 3d at 119.

Defendants also explained that Plaintiffs' attempt to challenge the WTC 7 Reports directly under the NCST Act is time-barred because they filed suit well beyond the six-year statute of limitations in 28 U.S.C. § 2401, and Plaintiffs' assertions of error in the WTC 7 Reports, which they characterize as a "sham report," do not suffice to toll the statute of limitations under a theory of fraudulent concealment. Def. Mem. at 38-40; *cf. Williams v. Conner*, 522 F. Supp. 2d 92, 100 (D.D.C. 2007). In their opposition brief, Plaintiffs rest their fraudulent concealment argument on the notion that NIST was obligated to, but did not, disclose "computer modelling" information in the WTC 7 Reports. *See* Pl. Opp. at 37. However, the NCST Act does not require disclosure of specific data or other information in a report. *See* 15 U.S.C. § 7307. To the contrary, the NCST Act channels any request for information through the FOIA process. *Id.* § 7306; *see* FAC ¶ 60 (acknowledging Plaintiff Brookman requested this information through FOIA but that his request was denied). And courts have repeatedly upheld NIST's responses to FOIA requests seeking data,

including computer modelling information, relating to the WTC 7 investigation. *Cole v. Copan* ("*Cole II*"), No. 19-1182, 2020 WL 7042814, at *5-6 (D.D.C. Nov. 30, 2020) (upholding NIST's refusal to release "'[a]ll input and result files' of each computer model used by NIST to study the structural response and collapse propagation phase of WTC 7, as well as 'all Excel spreadsheets and other supporting calculations used to develop floor connection failure modes and capacities'"); *Quick v. U.S. Dep't of Commerce*, 775 F. Supp. 2d 174, 178, 180-81 (D.D.C. 2011) (upholding NIST's refusal to release certain raw data files relating to its WTC 7 investigation). NIST cannot have engaged in "fraudulent concealment" by failing to disclose information it was not required to disclose. Although Defendants cited these FOIA cases in their opening brief, Plaintiffs' opposition does not acknowledge them, much less attempt to reconcile them with their theory of fraudulent concealment. Plaintiffs' attempt to evade the statute of limitations by invoking a theory of fraudulent concealment should thus be rejected.

As further explained in Defendants' opening brief, even aside from the fact that Plaintiffs' NCST Act claim is untimely, the WTC 7 Reports do not qualify as final agency action subject to APA review. Def. Mem. at 37-38. Plaintiffs make no attempt to argue that the WTC 7 Reports qualify as final agency action, thus conceding the point. Instead, Plaintiffs simply assert that the Court can review "blatantly lawless agency action," citing *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986), and *Leedom v. Kyne*, 358 U.S. 184 (1958)—neither of which is apposite. In *Bowen*, the Court held judicial review of Medicare Part B regulations—which qualified as final agency action—was not barred by the Medicare Act. *See Bowen*, 476 U.S. at 679-80. In *Leedom*, the Court held that, where the plaintiffs were attempting to enforce a statutory right that Congress had conferred, a court could act to "strike down an order of the [National Labor Relations] Board made in excess of its delegated powers and contrary to a specific prohibition in

the [National Labor Relations] Act" that was "clear and mandatory." *Leedom*, 358 U.S. at 188-89.

Plaintiffs also cite *NAACP*, which recognized that courts may in some circumstances conduct

nonstatutory review of ultra vires claims. *See NAACP*, 496 F. Supp. 3d at 16.

 None of these cases supports judicial review of Plaintiffs' NCST Act claim. Unlike in

*Leedom*, Plaintiffs have no statutory right at stake, and their FAC nowhere asserts that NIST acted

in excess of statutory authority in issuing the WTC 7 Reports. Plaintiffs cannot amend their

complaint in their response to a motion to dismiss. *Sanchez-Mercedes v. Bureau of Prisons*, 453

F. Supp. 3d 404, 430 n.21 (D.D.C. 2020), *aff'd,* No. 20-5103, 2021 WL 2525679 (D.C. Cir. June

2, 2021). Nor could they plausibly state an ultra vires claim. NIST was clearly authorized under

the NCST Act to conduct an investigation of the 9/11 building collapses and issue the WTC 7

Reports. *See* 15 U.S.C. §§ 7307, 7311. Plaintiffs' unsupported accusations of fraud cannot

transform an unreviewable APA claim into a reviewable ultra vires claim. *Cf. Mittleman v. Postal*

*Regul. Comm'n*, 757 F.3d 300, 307–08 (D.C. Cir. 2014) (recognizing ultra vires review is "quite

narrow"). Rather, "[t]he presumption of regularity supports the official acts of public officers and,

in the absence of clear evidence to the contrary, courts presume that they have properly discharged

their official duties." *Morris v. Sullivan*, 897 F.2d 553, 560 (D.C. Cir. 1990) (internal quotation

omitted). The situation here stands in contrast to both *Leedom* and *NAACP*, where it was

undisputed that the agency had not complied with the statute at issue. *See Leedom*, 358 U.S. at

187; *NAACP*, 496 F. Supp. 3d at 17.

 Finally, Plaintiffs are barred under principles of issue exhaustion from challenging the

WTC 7 Reports based on arguments that, by their own description, Plaintiffs failed to raise until

their IQA correction request, submitted over a decade later. Def. Mem. at 40-41. Indeed, Plaintiffs'

NCST Act claim simply duplicates their IQA claims, which are themselves barred for the reasons

explained above. Although Plaintiffs argue that "Defendants cannot have it both ways," Pl. Opp. at 40, Plaintiffs cite no authority for the notion that they can obtain judicial review of matters that are committed to agency discretion or do not qualify as final agency action simply by circumventing the directly applicable statute in favor of a different one. Plaintiffs' NCST Act claim therefore should be dismissed.

### C.   Plaintiffs' Procedural Claim Fails To Identify a Plausible Procedural Violation Cognizable Under the APA

In connection with Count X, which asserts that NIST's responses to Plaintiffs' IQA correction request and appeal violated two procedural requirements, Plaintiffs fail to state a claim because, as with their other claims, they fail to challenge a final agency action. Def. Mem. at 42. Again, Plaintiffs' failure to argue otherwise amounts to a concession and warrants dismissal of their claim. They also cannot show that the procedures that they allege were violated are aimed at protecting individual due process rights because the IQA confers no right to information or its correctness are at stake. *See id.* at 42-43. Plaintiffs also fail to state a claim insofar as they seek to apply to NIST's response to their appeal a procedure in NIST's IQA guidelines that does not apply to appeals, and their assertions otherwise are facially inconsistent with NIST's responses, which do include a point by point analysis in response to Plaintiffs' original IQA correction request and expressly state that the individuals who reviewed the appeal took no part in the consideration of Plaintiffs' original request. *See id*. at 43-44.

In their opposition, Plaintiffs first return to the issue of standing, arguing, as Defendants acknowledged in their opening brief, that the causation and redressability prongs of standing are relaxed in the context of procedural claims. Pl. Opp. at 40-41; *see* Def. Mem. at 17. However, as Defendants further explained, Plaintiffs nevertheless lack standing to assert this claim for the same reasons explained in connection with Plaintiffs' other IQA claims. The required "concrete interest"

for procedural standing is akin to the injury-in-fact required in a traditional standing analysis. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009) ("Unlike redressability, . . . the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."). Thus, Plaintiffs' failure to demonstrate an informational or organizational injury sufficient to pursue their other IQA claims also defeats their standing for Count X. Plaintiffs fail to argue otherwise.

Plaintiffs also fail to respond to Defendants' argument regarding the lack of a final agency action, again conceding that this APA claim fails to state a claim on that basis alone. *Doe #1*, 554 F. Supp. 3d at 119. Plaintiffs otherwise rely on their earlier argument that the D.C. Circuit's decision in *Prime Time* allowed for APA review of IQA claims—a notion that other courts have rejected and that is inconsistent with the D.C. Circuit's opinion, as explained *supra*. The remainder of Plaintiffs' argument regarding Count X consists of conclusory assertions that fail to support their claim. Count X therefore should be dismissed.

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' opening brief, this case should be dismissed in its entirety with prejudice and without leave to amend.

May 2, 2022                          Respectfully submitted,
                                     BRIAN M. BOYNTON
                                     Principal Deputy Assistant Attorney General
                                     MARCIA BERMAN
                                     Assistant Director, Federal Programs Branch

                                     */s/ Kathryn L. Wyer*
                                     KATHRYN L. WYER
                                     Federal Programs Branch
                                     U.S. Department of Justice, Civil Division
                                     1100 L Street, N.W., Room 12014
                                     Washington, DC   20005
                                     Tel. (202) 616-8475 / kathryn.wyer@usdoj.gov
                                     *Attorneys for Defendants*

23